**Opinion filed March 26, 2009**



In The

# Eleventh Court of Appeals

———————

## No. 11-07-00169-CV

———————

## GLENN ARNOLD WRIGHT AND FARON GRYDER, Appellants

## V.

## JODIE ILEANE WRIGHT, Appellee

**On Appeal from the County Court at Law**

**Ector County, Texas**

**Trial Court Cause No. CC-18,611**

### O P I N I O N

After more than 26 years of marriage, Jodie Ileane Wright sued Glenn Arnold Wright for divorce on March 14, 2006. In an amended pleading filed on February 22, 2007, she asked for a disproportionate share of the community estate. Because Glenn had transferred to an employee, Faron Gryder, 49% of the shares in one of their companies three days after she filed for divorce, Jodie named Gryder as a co-respondent. All three parties entered into a mediated settlement agreement (MSA) in which they settled all disputes except that they reserved for trial Jodie's claim that the transfer of stock to Gryder was a fraud on the community.

Glenn and Gryder assert that the MSA limited Jodie to an actual fraud claim and that she breached the MSA by amending her trial petition to include constructive fraud. Based on that

premise, they argue that Glenn and Gryder had the right to rescind the MSA. We disagree. The MSA reserved a "cause of action for fraud on the community" that included fraud, constructive fraud, and breach of fiduciary duty and was consistent with Jodie's claim (before the MSA) to a disproportionate share of the community estate. We affirm the trial court's award of $318,500 to Jodie for Glenn's fraud on the community. We remand for a determination of the appropriate amount of attorney's fees that should be awarded to Jodie and for the trial court to reform the decree of divorce pursuant to this opinion.

*Background Facts*

Jodie filed for divorce on March 14, 2006. On that same day, Glenn withdrew all the funds from their bank accounts with Security State Bank. He also withdrew the funds in his individual savings account and those in Jodie's savings account. Glenn admitted that he thought that Jodie was going to sue him for divorce and that he had withdrawn the money "to protect [himself]." Glenn said that he applied the funds to pay down a revolving line of credit the company owed the bank. Later, after Jodie complained to Security State Bank, Glenn replaced the funds to her savings account.

Glenn also acted quickly to transfer the titles to their jointly owned Harley Davidson motorcycles. He transferred the titles to their two sons, but Jodie did not learn of Glenn's action until the boys arrived at their home to take possession of the motorcycles. Jodie said the only problem she had with the boys picking up the motorcycles was that she knew what their dad had done and that she did not want them to get into trouble for it.

Glenn and Jodie owned five companies: World Sealing Corporation; Shaneda Machine, Inc.; Turbo Specialties & Machine Co., Inc.; Turbo Custom Components, Inc.; and Permian Valve Repair, Inc. They began Shaneda Machine in 1979 as a general machine shop. Shaneda Machine had revenues of $3.5 million in 2005 and specialized in the repair of industrial compressors and pumps and large industrial electric motors and generators.

On March 17, 2006, three days after Jodie filed for divorce, Glenn transferred 49% of the stock of Shaneda Machine to Gryder. Gryder admitted that he did not pay anything for the stock but maintained that the shares were for his services over the past years as an employee of Shaneda Machine. On that same day, Glenn had the bylaws of Shaneda Machine restated to remove Jodie as a director and to leave himself as the sole director.

2

On February 22, 2007, Jodie filed her first amended original petition for divorce, requesting a disproportionate share of the community estate and naming Gryder as a co-respondent. She alleged in Paragraph 16:

*Relief from Third-Party for Fraudulent Transfer*

Co-Respondent is alleged to be the holder and/or owner of certain stock in Shaneda Machine, Inc. *that was fraudulently transferred by Respondent to Co-Respondent, Faron Gryder, without consideration and/or for less than reasonably equivalent value. The purpose of the transfer was to defraud Petitioner's property rights in that property* and/or Petitioner's separate property rights in that property, and Co-Respondent had notice of Respondent's intent to injure Petitioner's rights. Respondent has transferred to Co-Respondent certain stock in Shaneda Machine, Inc. (emphasis added).

The prayer in Jodie's first amended petition requested the following:

Petitioner prays that the Court find that the items were transferred to Faron Gryder in fraud of Petitioner's right in those assets and that, after notice and hearing, the Court enter an order setting aside the transfer *as a fraud on the community and declaring the assets to be the community assets of Petitioner and Respondent and/or Petitioner's separate property* (emphasis added).

On April 10, 2007, Glenn, Jodie, and Gryder signed an MSA that set out in an exhibit the one matter that was reserved for trial:

2. Jodie Wright and her attorney . . . will agree to a new trial being granted in the cause of action *for fraud on the community* against 3rd Party Respondent, Faron Gryder; if the Court should find the conveyance of stock shares in Shaneda Machine Inc. by Glenn Wright to Faron Gryder constitutes a *fraud on the community*, Glenn Wright will pay to Jodie Wright the sum equal to 50% of the value as determined by Jeannie McClure ASA, 2/28/07, of the shares of Shaneda Machine Inc. awarded back to the community estate after adjudication of that claim. If there is a finding of no fraud and Mr. Gryder prevails, the settlement set out herein will stand (emphasis added).

On April 30, 2007, one day before trial on Jodie's fraud on the community claim, Jodie filed a motion to limit evidence to the issue of whether the transfer of Shaneda Machine stock was fraudulent and, if so, whether one-half of the value of the shares would be paid to Jodie "with the Court having available remedies to impose constructive trust, void transfer, and/or money judgment." On May 1, Glenn and Gryder argued to the trial court that the MSA only reserved a claim of actual fraud and did not encompass a claim for constructive fraud. Jodie argued that her earlier pleadings asserted claims for both actual and constructive fraud and that the MSA, by its

reference to a claim of "fraud on the community," reserved claims for both types of fraud. The trial court ruled that the term "fraud on the community" in the MSA included constructive fraud.

Jodie's counsel requested leave to file a trial amendment to clearly set forth the issues to be tried and to ensure that her pleadings complied with the MSA. Glenn and Gryder objected and argued that they were entitled to seven days notice of any amendments. The trial court ruled that Jodie could amend her pleadings; however, the trial court postponed the trial until May 15. That afternoon, Jodie filed a second amended petition that set out specific details of her claims for constructive fraud, actual fraud, and fraud on the community. Her petition explicitly recognized that she was bound by the terms of the MSA, stating that, "to the extent these pleadings are contrary to that Mediated Settlement Agreement, the Mediated Settlement Agreement shall prevail."

After receiving the second amended petition, Glenn and Gryder filed jury demands on May 9. The trial court ruled that the demands were untimely because the nearest setting would have to be in late August (changed later to October) and would impair the court's docket. Following a bench trial, the trial court found that, by transferring the stock, Glenn had committed actual fraud, constructive fraud, and fraud on the community and that Gryder had committed fraud on the community. The trial court awarded a money judgment of $318,500 to Jodie. The trial court ordered that the money judgment be secured with a lien, security interest, escrow agreement, and UCC filing and ordered Glenn to additionally sign a promissory note for $318,500; however, Jodie has conceded in her appellate brief that these measures were inappropriate under the MSA.

*Fraud on the Community*

In their first issue, Glenn and Gryder argue that Jodie had breached the MSA and, therefore, that Glenn had the right to rescind it. Their principal contention is that the MSA only reserved a claim for actual fraud. We disagree. The parties' pre-MSA pleadings were in many ways broadly phrased. Jodie's pleadings contain the term "actual fraud," but they also raised a constructive fraud or fraud on the community claim. Jodie alleged:

> [The Shaneda Machine stock] was *fraudulently transferred by [Glenn] to [Gryder] without consideration and/or for less than reasonably equivalent value. The purpose of the transfer was to defraud [Jodie's] property rights in that property* . . . and [Gryder] had notice of [Glenn's] intent to injure [Jodie's] rights (emphasis added).

A fiduciary duty exists between spouses regarding the community property each controls. *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ). The

4

breach of this duty is termed "fraud on the community," a judicially created concept based on the theory of constructive fraud. *Zieba*, 928 S.W.2d at 789. "Fraud on the community" and "constructive fraud" are essentially the same tort. *In re Marriage of Moore*, 890 S.W.2d 821, 827 (Tex. App.—Amarillo 1994, no writ). It is constructively fraudulent for one spouse to dispose of the other spouse's interest in community property without that spouse's knowledge or consent. *In re Marriage of DeVine*, 869 S.W.2d 415, 428 (Tex. App.—Amarillo 1993, writ denied).

The MSA referred to Jodie's fraud on the community cause of action, described a constructively fraudulent action, and provided a fraud on the community remedy. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998) (trial court can consider fraudulent conduct as one of the factors in determining a just and right division of the community and can award the wronged spouse a money judgment to recoup his or her share of the community estate lost through the other spouse's actions).

Jodie's second amended petition breached the MSA by asking for additional remedies, and the trial court erred by awarding them. However, Jodie also pleaded that, if her petition was contrary to the MSA, then it controlled. Jodie's breach was not material, and it does not justify rescission because the erroneously granted relief can be easily addressed. Glenn and Gryder's first issue is overruled.

Their fourth, fifth, sixth, and seventh issues are also overruled because they are all based on the assumption that Jodie breached the MSA by making "new claims." In those issues, Glenn and Gryder assert that the trial court erred in allowing Jodie to proceed to trial on an amended pleading that asserted new claims that contravened the MSA, that they did not have adequate time to prepare a defense to the "new claims," that they did not have an opportunity to do pretrial discovery on the "new claims," and that they were entitled to request a jury in view of the "new claims." Not only did Jodie not assert a new claim, but Glenn and Gryder have otherwise failed to establish an abuse of discretion. The parties had at least a year to conduct discovery. When Jodie requested leave to file a trial amendment, the court reset the trial to begin fifteen days later. During that time, neither Glenn nor Gryder filed a motion for continuance or requested additional time to conduct discovery. Consequently, their complaint was not preserved for review. *See Lebron v. Citicorp Vendor Fin., Inc.*, 99 S.W.3d 676, 681 (Tex. App.—Eastland 2003, no pet.). Additionally, because their jury requests were not filed until May 9, they were untimely. Tex. R. Civ. P. 216.

5

*Legal and Factual Sufficiency of the Evidence*

In their second and third issues, Glenn and Gryder contend that the evidence was legally and factually insufficient to support the judgment in favor of Jodie. Again, they argue that it was reversible error for the trial court to have found liability based on constructive fraud or breach of a fiduciary duty because the MSA only reserved a claim for actual fraud. We rejected this position in their first issue.

The credibility of the witnesses was crucial to the fact-finding process by the trial court. As the trier of fact, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Belew v. Rector*, 202 S.W.3d 849, 855 (Tex. App.—Eastland 2006, no pet.). In its findings of fact, the trial court expressly found that the testimony of Glenn and Gryder was not credible.

Because findings of fact in a bench trial have the same force and dignity as a jury verdict, we review them for legal and factual sufficiency of the evidence under the same standards we apply in reviewing a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *Id.* The factfinder is the only judge of witnesses' credibility and the weight to give to testimony. *See City of Keller*, 168 S.W.3d at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

In a traditional fraud cause of action, a plaintiff must show six traditional elements. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183 (Tex. 1977). As between spouses, the six elements need not be shown. A spouse commits actual fraud if he or she transfers community property or expends community funds for the primary purpose of depriving the other spouse of the use and enjoyment of the assets involved in the transaction. *Horlock v. Horlock*, 533 S.W.2d 52, 55 (Tex. Civ. App.—

6

Houston [14th Dist.] 1975, writ dism'd). Actual fraud between spouses involves dishonesty of purpose or intent to deceive. *Id.* at 55.

There was legally and factually sufficient evidence to support the trial court's finding for Jodie on a claim of actual fraud. Glenn's intent to deprive Jodie of the use and enjoyment of community assets was shown by his actions in draining their bank accounts (including Jodie's savings account), quickly transferring title to the Harley Davidson motorcycles to their sons, removing Jodie as a director of Shaneda Machine, and transferring almost half of the stock of Shaneda Machine to Gryder – within days of Jodie's filing a divorce action – without her knowledge or consent. Glenn testified that he wanted "to protect [himself]" by draining their bank accounts. The trial court could infer that the purpose of Glenn's transfer of the Shaneda Machine stock to Gryder was to deprive Jodie of any interest in that company. Glenn's actions demonstrated an intent to deprive Jodie of as much of the community property as possible.

The evidence before the trial court was basically a swearing match between Glenn and Gryder on the one hand and Jodie on the other. Glenn and Gryder testified that Glenn had agreed to transfer "an interest" in Shaneda Machine to Gryder as an inducement for Gryder to move from Dallas to Midland in 2003 to manage the company. However, their testimony was not specific on the amount of stock in Shaneda Machine, only that Gryder would get an interest. Glenn claimed that the conversation occurred in Jodie's presence, which she denied. Yet, Glenn did not transfer any stock until March 17, 2006, and then it was a 49% interest. If there was an earlier conversation concerning some interest in the company, there was no reference to what percentage of the company that Gryder would own or what he would pay for an interest in the company until October 2005. Both Glenn and Gryder admitted that their "agreement" had never been in writing. Jodie testified that she had never had a conversation with anyone about Glenn transferring stock to Gryder. Jodie agreed that Gryder should have an interest in the company, "[m]aybe a little bit, but not 49 percent." Jodie also testified that it was not fair to her or their children for Glenn "to transfer over $600,000 in value" to Gryder, an employee, as a gift.

Jimmy B. Todd, the attorney for Shaneda Machine who prepared the documents for the stock transfer, said that he did not recall whether he knew on March 17 that Jodie had filed for divorce, but Glenn "indicated to [him] that he was having family problems." Todd confirmed that Jodie was removed as a director on March 17, leaving Glenn as the sole director. Todd acknowledged that there was a buy/sell agreement built into the bylaws of the corporation, explaining that a shareholder

7

could not sell stock to a third party without first offering the shares to the corporation. However, Todd testified that the shares were not offered to the company because: "[T]here was no particular sale. It was a transfer." That statement indicates that the "transfer" was for no consideration. Todd's testimony does not demonstrate that he knew much about the transaction, only that he had been asked to transfer the stock and he complied.

Glenn testified that he decided it was necessary to update his minute books to give the stock to Gryder although he had not paid attention to the minute books for ten years. He did not deny that he chose the time shortly after Jodie filed for divorce to remove her as a director, leaving him the sole director of Shaneda Machine. Despite his actions on March 14 and 17, Glenn claimed that he did not know that Jodie had filed for divorce on March 14. Todd testified that the minute books had been lost and that Glenn had requested that he recreate the minute books. Todd testified that his office was able to reconstruct the minute books by making copies of what he had in the file. Todd also testified that Glenn had requested the minute books in January or February, but Todd did not remember why the books were needed, only that it was about the time that Glenn had purchased another company. Todd's testimony does not support the testimony of Glenn and Gryder concerning any agreement concerning the stock. Todd admitted that Jodie had not been contacted about the stock transfer.

Veda Jones with Todd's law firm testified that she prepared the new stock certificate transferring stock to Gryder. She was familiar with the corporate documents of Shaneda Machine and knew that Jodie had been a director until March 17 when Glenn was made the only director. She was not aware if Jodie was contacted about the stock transfer.

Glenn objects to the trial court's finding that he did not have sole management and control over the stock. The implication is that he believed that he was entitled to make the transfer to Gryder as the sole manager of the stock because it was in his name. Glenn cites as his authority TEX. FAM. CODE ANN. § 3.104 (Vernon 2006). We agree with Glenn that the stock was subject to his management and control. We do not agree that Section 3.104 authorized him to act without Jodie's consent. As a director, Jodie was entitled to participate in a decision of this magnitude affecting Shaneda Machine. She was entitled to be consulted before Glenn conveyed almost one-half of their principal company for no consideration.

The managing spouse may make moderate gifts for just causes to persons outside the community. *Mazique v. Mazique*, 742 S.W.2d 805, 808 (Tex. App.—Houston [1st Dist.] 1987, no

8

writ); *Hartman v. Crain*, 398 S.W.2d 387, 390 (Tex. Civ. App.—Houston 1966, no writ). But a gift of community funds that is capricious, excessive, or arbitrary may be set aside as a constructive fraud on the other spouse. *Mazique*, 742 S.W.2d at 808; *Horlock*, 533 S.W.2d at 55. The trial court obviously concluded that this gift was excessive.

As its title "Protection of Third Persons" reflects, Section 3.104 primarily addresses a community property transfer from the standpoint of a third party. In general, community property is subject to "joint management, control, and disposition of the spouses unless the spouses provide otherwise by power of attorney in writing or other agreement." TEX. FAM. CODE ANN. § 3.102(c) (Vernon 2006). However, Section 3.104 provides a presumption to a third party where community property is held in one spouses's name only.

To rely on the presumption of Section 3.104, a grantee has to show three things: (1) the property conveyed was presumed to be subject to the named spouse's sole management; (2) the grantee was not party to a fraud on the unnamed spouse; and (3) the grantee had no notice of any lack of authority of the named spouse to convey the property. Section 3.104(b); *Jean v. Tyson-Jean*, 118 S.W.3d 1, 6 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Keeping in mind that the trial court found that Glenn and Gryder were not credible witnesses, we cannot say that the trial court erred in finding that Gryder failed to show that he was not a party to Glenn's fraud on the community. However, Jodie agreed in the MSA that she was not seeking the Shaneda Machine shares back, only a money judgment as part of her share of the community.

It is difficult to believe that Gryder did not realize that Jodie should have been consulted about the transfer and that Jodie should have been there when the transfer took place. At a minimum, there should have been some evidence that Jodie consented to the transfer since Gryder did not pay for the stock. Gryder knew that Jodie and Glenn had split up in "the first part of March" and knew that, "[a]t the end of March 2006," Jodie and Glenn were going through a divorce.

Gryder said that he had gone to work for Shaneda Machine in 1982, that he became a vice president of the corporation in 1984, and that he had known Jodie since 1982. Glenn, however, testified that Gryder came to work at Shaneda Machine in 1988, not 1982. Gryder testified that he left Shaneda Machine in 2000 because he had wanted an interest in the company and had become very disgruntled. He worked for his brother-in-law in Dallas between 2000 and 2003 when he got a call from Glenn asking him to return to Midland. Gryder said that Glenn offered a $75,000 salary and "some shares in Shaneda." Gryder testified that he threatened to quit in October 2005 and that

9

it was then Glenn told him the interest would be 49%. Gryder acknowledged that he continued to work at Shaneda and that nothing happened until March 17, 2006. Nothing about their agreement was in writing. Although Gryder had known Jodie for years, he said that she did not participate in or discuss this transaction with him.

Even from their testimony, it is unclear when Glenn decided to give Gryder 49% of the company. In a portion of Glenn's deposition read during the trial, Glenn said that Gryder gave his resignation about the time Glenn was being sued for divorce. Glenn said he took Gryder down to Todd's office and said, "[I]f you get a percentage of this company are you going to stay?" "And he said, that's all it takes to make me stay." That testimony indicates that they agreed on the 49% interest on March 17, 2006. At the time of trial, however, Glenn and Gryder testified that they had agreed on the 49% interest the previous October.

Glenn admitted that he knew there would be tax consequences to the transfer of stock. It would appear that a gift of this magnitude involved a substantial gift tax payable by the community. Glenn stated that Shaneda Machine was going to take care of any taxes and that he had talked to Jodie about Shaneda Machine paying the tax. Glenn acknowledged that he had not told Michael Barth, the CPA, about the transfer and that he did not refer to the transaction in the 2006 tax return. Gryder also stated that he knew there would be tax consequences but that he had not mentioned this transaction in his tax return.

A presumption of constructive fraud arises when one spouse disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. *Massey v. Massey*, 807 S.W.2d 391, 402 (Tex. App.—Houston [1st Dist.] 1991, writ denied). Glenn had the burden of proof to establish that the transfer of the stock to Gryder was not unfair to the rights of Jodie.

Jeannie McClure was the appraiser who had been appointed by the court to appraise the companies owned by Jodie and Glenn. McClure testified that, if Glenn had a contractual obligation to convey stock to Gryder, the conveyance had a benefit to the community estate to balance the detriment. McClure believed that the community estate gained at least as much as $477,750 by having Gryder in the management of Shaneda Machine because his presence allowed Glenn to increase the value of the other companies. However, her belief would only be relevant if the trial court had found that there was a contractual obligation to convey Gryder the 49% interest when he moved back to Midland in 2003. McClure admitted that the Turbo companies had increased in value

10

due to Glenn's management and the improvement in the Midland economy since 2003. She agreed that, if Gryder had not been given the stock, the value of Shaneda Machine on February 28, 2007, would still be $1,300,000. Jodie testified that the transfer was not fair to her because Glenn had transferred an interest worth $600,000 to Gryder as a gift. She said that she and Glenn "had discussed that one day when he retired that my children would take over the company and run it."

The trial court determined that the stock transfer was grossly unfair to the community estate. The trial court had before it the MSA. Glenn was to receive Turbo Specialties & Machine Co., Inc. and Turbo Custom Components, Inc. valued at $1,010,000; World Sealing Corp. valued at $2,340; Permian Valve valued at $119,201; and 51% of Shaneda Machine valued at $663,000. In determining whether the transfer of the 49% to Gryder was fair to the community, the trial court could treat the community assets as including the entire value of Shaneda Machine at $1,300,000 and could consider the fact that Glenn still had control of the company. *In re Marriage of DeVine*, 869 S.W.2d 415.

Under the MSA, Jodie was to receive their home (net value of $517,400), her 401(k) (worth $54,225), Glenn's 401(k) (worth $114,800), and a $600,000 payment from Glenn. Thus, earning assets transferred to Glenn were valued at $2,431,541 and earning assets transferred to Jodie were $769,025. Even taking into consideration only the net value of $663,000 for his remaining Shaneda Machine stock, Glenn was to receive earning assets of stock worth $1,131,541 versus Jodie's $769,025. Had there been no transfer of stock, the community would have had another $637,000 to divide.[1] Glenn's transfer of the stock to Gryder for no consideration was unfair to Jodie and the community being divided. Moreover, tax consequences of the transaction were not considered by Gryder or Glenn. The trial court did not err in finding that Glenn's intent was to deprive Jodie of a significant portion of the community assets and that the transfer was unfair to her. We hold that the evidence was legally and factually sufficient to support the finding that Glenn committed a fraud on the community. The second and third issues of Glenn and Gryder are overruled.

*The Agreed Measure of Recovery Under the MSA*

In Paragraph (i) of Glenn's eighth issue, he contends that the trial court erred in awarding Jodie $318,500 for Glenn's fraud on the community because it was an improper measure of recovery

---

[1]Apparently, that is why the parties agreed that, if the court found a fraud on the community, Jodie was to receive a sum equal to 50% of the value as determined by McClure on February 28, 2007. McClure valued Shaneda Machine at $1,300,000, and the MSA provides that, if there was a fraud on the community, the shares are "awarded back to the community estate" for purposes of determining the sum to be awarded to Jodie.

under the MSA. Glenn and Gryder argue that the value of the stock conveyed to Gryder was worth $477,750 and that half of $477,750 is $238,875; therefore, $238,875 is the amount that the trial court should have awarded Jodie. The $477,750 number is based on testimony by McClure at trial. The attorneys for Glenn and Gryder obtained McClure's agreement that a minority interest in a company is discounted for lack of marketability and lack of control. Viewing the value from Gryder's standpoint, McClure testified that she would take the fair market value of the entire business, $1,300,000 and take 49% of that number. Then she would take 75% of that number (a 25% discount). Thus, the value of the interest conveyed to Gryder was $477,750. But that is not what was agreed to by Glenn and Gryder in the MSA. The MSA provided:

> If the Court should find the conveyance of stock shares in Shaneda Machine Inc. by Glenn Wright to Faron Gryder constitutes a fraud on the community, Glenn Wright will pay to Jodie Wright the sum equal to 50% of the value as determined by Jeannie McClure ASA, 2/28/07, of the shares of Shaneda Machine Inc. awarded back to the community estate after adjudication of that claim.

We agree with the trial court that this provision of the MSA meant that the court was to value the shares from the standpoint of the community estate, not from Gryder's viewpoint. The court correctly started with the $1,300,000 value for Shaneda Machine, the value determined by McClure as of February 28, 2007. The trial court then found that 49% of $1,300,000 equaled $637,000 and that 50% of that value was $318,500, the amount awarded to Jodie.

Although we reach the same interpretation as the trial court based solely on a reading of the text of the paragraph in the MSA, the surrounding circumstances at the time of the MSA also support our conclusion. We note that in her letter to the Wrights dated March 28, 2007, prior to the mediation that resulted in the MSA, McClure described her assignment:

> McClure, Schumacher & Associates, L.L.P. has been engaged to provide an opinion of fair market value regarding the voting common shares of Shaneda Machine, Inc.

> Further, we have been asked to frame our opinion assuming the ownership at issue represents a 100% interest in Shaneda Machine, Inc.

The MSA referred to McClure's valuation of Shaneda Machine as of "2/28/07." Glenn and Gryder agreed that the sum to be paid to Jodie would be based on the value of the shares to the community estate, not the value to Gryder. When everyone agreed to the MSA, they had only McClure's valuation of the companies to the community estate as of February 28, 2007; there was nothing in the surrounding circumstances to even suggest that there should be discounts. Under the

MSA, the shares were viewed as being "awarded back to the community estate," a value of $637,000 (their value as of "2/28/07"), and Jodie was to be awarded one-half of that amount ($318,500). Glenn is bound by the MSA. The trial court did not deviate from the MSA. Glenn and Gryder's Issue No. 8(i) is overruled.

*Jodie's Award of Support Pending Appeal*

The divorce decree was signed by the trial court on May 25, 2007. Glenn and Gryder filed their notices of appeal. Jodie filed a motion for temporary orders pending appeal, asking for a minimum of $4,000 per month in support and for exclusive occupancy of their home. On June 25, the trial court ordered Glenn to pay Jodie temporary spousal support pending appeal of $4,400 per month and granted Jodie the exclusive occupancy of their home. Although the trial court ordered that the temporary spousal support pending appeal should not be an offset to its divorce judgment, Glenn argues that his payments for spousal support should be credited against Jodie's award under the decree of divorce. We agree.

Jodie filed her motion for temporary orders for support under TEX. FAM. CODE ANN. § 6.709 (Vernon 2006). To now make those temporary support payments permanent would mean that Jodie recovers a greater award than is allowed under their MSA. Glenn's tenth issue is sustained in part.

*Attorney's Fees*

In the divorce decree, the trial court awarded Jodie a judgment of $60,000 against Glenn for attorney's fees on appeal but decreed that Glenn would be entitled to a remittitur of $25,000 if he did not appeal to this court, a remittitur of $10,000 if a petition for review was not filed with the Texas Supreme Court, and a remittitur of $25,000 if a petition for review was not granted by the Texas Supreme Court. In Glenn's eighth and ninth issues, he argues that the trial court erred by granting an unconditional award of appellate attorney's fees in the amount of $60,000 to Jodie because (1) the MSA did not reserve that matter for the trial court's decision and (2) the award should have been conditioned upon success upon appeal. In his tenth issue, he argues that the award to Jodie for attorney's fees on appeal should be credited against her property award under the decree of divorce.

A trial court does not have inherent authority to award attorney's fees in a divorce action. *Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex. App.—Houston [14th Dist.] 1989, writ denied). Normally, attorney's fees for trial and appeal of a divorce are part and parcel of the property division. *Carle v. Carle*, 234 S.W.2d 1002, 1005 (Tex. 1950). Therefore, Glenn argues that the MSA was a

full settlement as to the division of their estate, except for the fraud on community claim, and any attorney's fees were part of that full settlement.

Jodie argues that the MSA did not preclude an award of attorney's fees because the appellate fees were not contemplated by the MSA. Jodie cites as support for her position *Butler v. Butler*, No. 05-02-01631-CV, 2003 WL 21983218 (Tex. App.—Dallas Aug. 21, 2003, no pet.) (mem. op.). The husband and wife in *Butler* executed an MSA. A month later, the husband filed a motion to reform, clarify, or strike the MSA. The matter was submitted to arbitration as required by their MSA, and the arbitrator entered an award resolving all property issues between the parties. The husband did not raise the issue of mutual mistake of fact in the arbitration. About four months after the arbitration, the trial court held a hearing on the wife's motion to enforce the MSA and the husband's supplemental motion to reform or strike the MSA. The trial court approved the MSA, confirmed the arbitration award, awarded attorney's fees of $6,200 to the wife, and signed the final decree of divorce incorporating the MSA.

The husband in *Butler* appealed, arguing that he and the wife had mistakenly overvalued their house and motor home at the time the MSA was executed. The court of appeals concluded that the trial court did not err in rendering the divorce decree based on the MSA. As to the award of attorney's fees to the wife, the court found that the husband had waived the issue by failing to provide any discussion, argument, or authority to support his contention. TEX. R. APP. P. 38.1(h). The court added that, even absent waiver, it found no merit in the husband's contention. The court noted that the MSA provided that each party was responsible for their own attorney's fees at the time the MSA was executed and that the attorney's fees awarded by the trial court were based on testimony of fees the wife had incurred after signing the MSA.

Jodie argues that their MSA was silent regarding any attorney's fees and that the trial court in this case heard testimony on attorney's fees that she might incur on appeal. However, her argument does not fully answer Glenn and Gryder's contention. Nor does her argument fully answer his contention that the trial court erred by awarding Jodie $60,000 in unconditional appellate attorney's fees.

Jodie cites *Keith v. Keith*, 221 S.W.3d 156, 171 (Tex. App.—Houston [1st Dist.] 2006, no pet.), for the proposition that an unconditional award of appellate attorney's fees does not require reversal; instead, the appellate court may modify the trial court's judgment to make the attorney's fees contingent upon the receiving party's success on appeal. *See also Houston Livestock Show &*

14

*Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 586 (Tex. App.—Austin 2003, no pet.). We agree. However, the record support for awarding attorney's fees in this case is unclear. We cannot tell what fees relate to Jodie's suit to enforce the MSA (a contract) and what fees relate to the fraud on the community claim and constitute a division of property precluded by the MSA. Also, there is the question of how Glenn's successful issues on appeal should affect the award of appellate attorney's fees to Jodie.

The divorce decree ordered that each party was responsible "for his or her own attorney's fees, expenses, and costs incurred as a result of legal representation through the trial of May 15, 2007 in this case." The general rule in Texas is that each party is responsible for his or her own attorney's fees. *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex. 1964). Attorney's fees are generally not recoverable from the other party in the absence of a specific statutory or contractual provision. *New Amsterdam Cas. Co. v. Tex. Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967); *Turner*, 385 S.W.2d at 233.

TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2008) provides that a person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for "an oral or written contract." For example, Texas courts have held that a wife may recover attorney's fees in connection with her suit for breach of a contractual alimony agreement incorporated into a final divorce judgment. *Conner v. Bean*, 630 S.W.2d 697 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Once the right to attorney's fees is established, the court may award attorney's fees for any appeal. *Cap Rock Elec. Coop., Inc. v. Tex. Utils. Elec. Co.*, 874 S.W.2d 92 (Tex. App.—El Paso 1994, no writ); *Gunter v. Bailey*, 808 S.W.2d 163, 165 (Tex. App.—El Paso 1991, no writ).

An MSA is a written contract. *Cayan v. Cayan*, 38 S.W.3d 161, 165 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("a [S]ection 6.602[2] agreement is binding, i.e., irrevocable, and a party to one is entitled to judgment based on the agreement"). Here, Glenn attempted to withdraw his consent to the MSA. Jodie was not required to file a separate suit for enforcement of the MSA. Section 6.602 of the Texas Family Code basically creates a procedural shortcut for the enforcement of MSAs in divorce cases. *Butler*, 2003 WL 21983218; *Boyd v. Boyd*, 67 S.W.3d 398, 402 (Tex. App.—Fort Worth 2002, no pet.); *Cayan*, 38 S.W.3d at 166. The trial court had the authority to

---

[2]TEX. FAM. CODE ANN. § 6.602 (Vernon 2006).

award Jodie attorney's fees attributable to her claim to enforce the MSA.[3] *Praeger v. Wilson*, 721 S.W.2d 597 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.). Thus, the trial court was authorized to award appellate attorney's fees related to Jodie's "suit to enforce" the MSA. Those fees are separate from Jodie's award under the MSA. However, we are unable to tell from the record what amount of attorney's fees were attributable to Jodie's suit to enforce the MSA.

Had there been no attempt by Glenn to withdraw from the MSA, the only basis for awarding attorney's fees to Jodie would have been under the trial court's equitable powers to make a just and fair division of the marital estate. *Carle*, 234 S.W.2d at 1005; *Chiles*, 779 S.W.2d at 129.[4] Jodie and Glenn agreed in the MSA on the just and fair division of the marital estate with the only question left being Jodie's claim of fraud on the community. An award of trial or appellate attorney's fees to Jodie for trying the fraud on the community claim is beyond the MSA. Again, we are unable to tell from the record the amount of the appellate attorney's fees related to the fraud on the community claim.

Glenn's eighth, ninth, and tenth issues are sustained in part and overruled in part. We remand to the trial court for a determination of the amount of attorney's fees that Jodie is entitled to in light of the respective successes of the parties on appeal to this court, the amount of attorney's fees attributable to Jodie's suit to enforce the MSA, and the amount of attorney's fees attributable to Jodie's claim of fraud on the community. The attorney's fees relating to Jodie's claim for a disproportionate share due to the fraud on the community should be credited against her share under the MSA. Attorney's fees relating to Jodie's suit to enforce the MSA should be a separate award.

*Additional Issues*

Jodie has agreed that both Glenn and Gryder are correct in Issue No. 8(ii) and that Glenn is correct in Issue No. 8(iii). The trial court should not have required Glenn to sign a promissory note in addition to the money judgment of $318,500, and the money judgment should not have been secured by a lien, security interest, UCC filing, or stock escrow agreement. We agree in part with the ninth issue. The trial court's judgment should be reformed to set contemporaneous deadlines for

---

[3]TEX. CIV. PRAC. & REM. CODE ANN. § 38.002 (Vernon 2008) requires that, to recover attorney's fees under this chapter, the claimant must present the claim to the opposing party. The purpose of claim presentment is to allow the person against whom the claim is asserted an opportunity to pay the claim within thirty days and avoid an obligation for attorney's fees. Presentment was unnecessary under the circumstances of this case.

[4]The court in *Butler* found that the appellant had waived the point. The statements by the court in *Butler* are consistent with our conclusion. The wife in *Butler* was entitled to attorney's fees for her "suit to enforce the MSA." As the *Butler* court noted, "Section 6.602 provides a procedural shortcut for the enforcement of MSAs in divorce cases, eliminating the need for a separate suit to enforce the [MSA]." *Butler*, 2003 WL 21983218 at *1.

delivery of documents; the deadline for payment of the money judgment of $318,500 should be deleted; the provision purporting to secure the money judgment should be deleted; the provision for a promissory note should be deleted; and the provision concerning security agreements, UCC filing statements, and stock escrow agreements should be deleted. The remaining arguments are overruled.

Although neither party has addressed the issue, we note that the record indicates that both parties have accepted benefits under the trial court's judgment. Normally, a litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he or she cannot afterward prosecute an appeal therefrom. *Carle*, 234 S.W.2d at 1004. This divorce needs to be concluded.

*This Court's Ruling*

We affirm the trial court's award to Jodie of $318,500 for her fraud on the community claim. We remand to the trial court for a determination of the attorney's fees that should be awarded to Jodie and for a reformation of the decree of divorce that is consistent with this opinion.

TERRY McCALL
JUSTICE

March 26, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

17