IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In re the Matter of:

JULIE ANN SKOGLUND, *Petitioner/Appellee,*

*v.*

JAMES DELL BARBOUR, II, *Respondent/Appellant.*

No. 1 CA-CV 22-0514 FC

FILED 08-27-2024

Appeal from the Superior Court in Maricopa County
No. FN2019-053196
The Honorable Melissa Iyer Julian, Judge

**VACATED AND REMANDED IN PART; AFFIRMED IN PART**

COUNSEL

Osborn Maledon PA, Phoenix
By David B. Rosenbaum, Warren J. Stapleton, Eric M. Fraser,
Travis C. Hunt
*Counsel for Petitioner/Appellee*

Stillman Smith Gadow, Phoenix
By Jennifer G. Gadow, Stephen R. Smith
*Co-Counsel for Respondent/Appellant*

Berkshire Law Office PLLC, Tempe
By Keith Berkshire, Alexandra Sandlin
*Co-Counsel for Respondent /Appellant*

---

## OPINION

Judge Andrew M. Jacobs delivered the opinion of the Court, in which Presiding Judge David B. Gass and Judge Brian Y. Furuya joined.

---

**J A C O B S**, Judge:

¶1        James Dell Barbour II ("Husband") appeals the superior court's order awarding 48.835% of the value of three community businesses to Julie Ann Skoglund ("Wife") and the finding that his cash withdrawals constituted waste of community funds during the marriage.  The superior court erred when it found Husband breached his fiduciary duty because he transferred community property without Wife's express consent.   We therefore reverse the allocation of the community property and remand for an equitable allocation of the affected community property.  We affirm the waste ruling.

### FACTS AND PROCEDURAL BACKGROUND

####    A.    Ownership of VIP

¶2        The parties married in 2000.  At the time, Wife worked as a realtor and Husband worked in the mortgage business.  In 2006, the parties started VIP Mortgage ("VIP"), which primarily originates and sells residential mortgage loans.  Husband and Wife provided $1 million in community funds to start VIP and another $450,000 in 2009.   At its inception, Husband was VIP's sole shareholder, incorporator, officer, and director.  Husband is still president and chief executive officer of VIP.

¶3        Soon after VIP started, the global economy crashed, wreaking havoc on VIP's subprime loan business.  By 2007, VIP had one employee other than Husband.   Around that time, VIP hired Husband's lifelong friend, Keith Teegardin, after the mortgage company Teegardin worked for collapsed.  Teegardin brought with him a team of 10–15 employees, an existing relationship with a home builder, and a significant book of 250 loans.  In 2007, Husband and Teegardin drafted a business plan reflecting a 50-50 partnership with a buy-in by Teegardin.  They never finalized the buy-in agreement.

¶4        Over the next several years, Husband and Teegardin operated under a "handshake."  Both testified they always intended for Teegardin to

receive an ownership interest in VIP in exchange for his initial and continued contributions. The superior court accepted Husband's testimony that without Teegardin's contributions, VIP would not have survived the financial crisis. Nonetheless, VIP's records did not identify Teegardin as an owner or shareholder. In 2008 and 2009, VIP paid Teegardin more than Husband and Wife earned from the business.

¶5 In response to requests from VIP's lenders, Husband and Teegardin discussed a succession plan in 2013. Husband met with VIP's auditor John Metz and attorney Jack Beaver. Beaver proposed two ways to formalize Teegardin's ownership interest. Teegardin could purchase the shares from Husband or VIP; alternatively, Husband could give the shares to Teegardin. Both options required an appraisal of VIP.

¶6 The initial draft appraisal "for purposes of implementing an Employee Stock Option Plan" valued VIP at $11.7 million in November 2013. After two more drafts, the appraisal value ended up at $4.43 million for a 49% interest in VIP. The superior court inferred that the effort to reduce the value of VIP was Husband's desire to minimize gift tax consequences.

¶7 In February 2014, Husband, Metz, and Beaver continued working on a buy-sell agreement to restrict the transfer of shares upon Husband's or Teegardin's death or divorce. In May 2014, Wife met with Husband and Beaver to discuss the proposed buy-sell agreement. She refused to sign it at that time. Wife opposed the agreement and asked for a new agreement identifying her as a VIP shareholder, allowing spouses to request an appraisal upon a triggering event, and adjusting the pay-out period. Husband opposed naming Wife as a shareholder to prevent her from becoming personally liable on VIP debts. But he agreed to name her as a VIP "founder by virtue of her 50% community property interest" and agreed to the other changes. Beaver sent Husband, Wife, and Teegardin a revised agreement reflecting these changes as well as a gift affidavit.

¶8 Wife again objected to the timing of a buy-out in the event of a divorce. Beaver proposed a change to provide that if a divorce occurs, VIP shares go to Husband, and Wife receives a greater amount of community property, if available, to which Husband agreed. Wife then hired her own attorney to review the agreement.

¶9 As the superior court's findings indicate, Wife consistently expressed her ownership interest in VIP as one entitling her to half of what remained after Teegardin was to be given 31% of VIP. When Wife's

attorneys asked how they determined Teegardin's 31% interest, Beaver explained that Husband intended to give him a substantial but non-controlling interest because he has been with VIP since the beginning and Husband felt he was owed that. To account for the community's investment of $1.45 million in VIP, Teegardin's interest was reduced to 31% instead of the originally anticipated 49%. Wife's attorney wrote that "Julie supports that decision," referring to Husband's plan to grant shares to Teegardin to "reflect his contribution to the company through his work efforts." Wife asked that in granting Teegardin his shares that she own half of the remaining shares, or 34.5%. After disagreements about other terms, Wife did not sign the agreement. Husband and Teegardin later signed the buy-sell agreement, which did not refer to Wife as a founder, effective January 1, 2014. Wife did not sign a spousal consent. From 2014 on, VIP records identified Teegardin as a shareholder and issued him K-1 tax forms as a 31% shareholder. As the superior court found, though Teegardin's 31% ownership share was known, Wife and her counsel failed to raise any concerns about Teegardin's 31% share during negotiations over the next four years. As the court noted, consistent with Wife's position in 2014, "her concerns centered on" being paid for "her half of the community's interest in the remaining 69% with a prompt payout."

¶10 Over the next few years, Wife did not formally consent to Teegardin's share. In October 2015, Husband and Wife signed gift tax returns showing a gift of VIP shares to Teegardin. The superior court found Wife did not realize she was signing a gift tax return. The transfer of VIP shares to Teegardin did not come up again until a 2018 discussion about life insurance and revising the buy-sell agreement. Wife hired attorney Gene Keller to review the agreement. He proposed some revisions — but none related to the transfer of an ownership interest to Teegardin. With Husband's consent, Beaver made "nearly all of the changes requested by [Wife's] attorney." However, Wife did not sign the 2018 agreement with these changes.

¶11 The superior court held that if a transfer of community property occurred without Wife's express consent, that transfer would "constitute a breach of that [fiduciary] duty" to Wife under *Gerow v. Covill*, 192 Ariz. 9 (App. 1998), and *Mezey v. Fioramonti*, 204 Ariz. 599 (App. 2003). The court then found Husband transferred the shares to Teegardin without Wife's consent, which it ruled was a fiduciary breach under those cases. The court also found Husband breached his fiduciary duty to Wife because he transferred a substantial community asset without "a demonstrable benefit to the community." As a result, the court awarded Wife 48.835% of the value of VIP, essentially giving her the value of half the shares

transferred to Teegardin. As the court noted, its ruling does not affect Teegardin's ownership. The court valued VIP at $88,119,099. As a result, Wife was entitled to an equalization payment of $43,023,962.

## B. Ownership of Other LLCs

¶12 Barbour Teegardin, LLC, was formed to purchase VIP's office building. Like VIP, the community owns 69% of Barbour Teegardin, LLC, and Teegardin owns 31%. The superior court found Wife was entitled to 48.835% of its value because the funds to buy the building in 2016 came from VIP.

¶13 Husband created Inventiv Technologies, LLC, after Wife filed for divorce. Wife alleged that he created Inventiv to funnel profits from VIP to a separate property company. The court agreed and found that this violated Husband's fiduciary duty to Wife, the Fraudulent Transfer Act (A.R.S. § 44-1004), and the preliminary injunction. The court awarded Wife 48.835% of Inventiv's value.

## C. Waste of Community Funds

¶14 Wife made several allegations of marital waste; only one is relevant to this appeal. Wife asserted that between 2007 and 2019, Husband spent $530,578 in cash for non-community purposes. Based, in part, on Husband's own estimations that he spent nearly $1 million in cash on strip clubs, sex workers, and extra-marital affairs, the superior court found that Wife met her prima facie case of showing these cash withdrawals were not made for the benefit of the community. The court also found Husband did not rebut this. After deducting the undisputed amount spent on one particular affair ($158,600) to avoid double-counting, the court awarded Wife one-half of the remaining $371,978 in cash withdrawals.

¶15 The superior court made written findings of fact and conclusions of law in an amended decree and later entered a final judgment. Husband timely appealed. We have jurisdiction under A.R.S. § 12-2101(A)(1).

## DISCUSSION

**I.    The Superior Court Applied an Incorrect Legal Standard When Considering Whether Transferring Shares to Teegardin Breached Husband's Fiduciary Duty.**

¶16        Husband does not dispute that he owed Wife a fiduciary duty.  Instead, he argues the court applied the wrong standard when deciding he breached his fiduciary duty.  Whether the court applied the correct legal standard is a question of law we review *de novo*.  *Mobilisa, Inc. v. Doe,* 217 Ariz. 103, 107 ¶ 9 (App. 2007).

### A.    The Superior Court Incorrectly Applied *Gerow* and *Mezey*.

¶17        The superior court found Husband breached his fiduciary duty to Wife when he transferred an interest in VIP to Teegardin without her consent.    As the court framed its inquiry, "[t]he question . . . is whether the transfer occurred without Wife's knowledge or consent, which would constitute a breach of that duty under *Gerow* and *Mezey*."  The court underscored this view of *Gerow* and *Mezey* by stating that the transfer to Teegardin was not "a business judgment related to VIP's management," making it nakedly a gift, reinforcing the requirement of consent to avoid fiduciary breach.

¶18        This reading of *Gerow* and *Mezey* is incorrect, because both cases stand for the proposition that unconsented transfers of community assets may be — but are not necessarily — breaches of fiduciary duties.  As we wrote in *Gerow*, "[r]emoval of community assets without spousal notice and/or approval *can* constitute a breach of that duty."  *Gerow,* 192 Ariz. at 18 ¶ 40  (emphasis added).  We similarly explained in *Mezey* that "*absent intervening equities*, a gift of substantial community property to a third person without the other spouse's consent *may* be revoked and set aside for the benefit of the aggrieved spouse."   204 Ariz. at 608 ¶ 38 (emphasis added).

¶19        Instead, the default rule in this area is that either spouse can dispose of community property or otherwise act for the community absent certain exceptions not applicable here.  *See* A.R.S. §§ 25-214(C); 25-215(D).  A spouse's ability to dispose of community property is subject to a fiduciary duty to the other spouse. *In re Estate of Kirkes,* 231 Ariz. 334, 335 ¶ 5 (2013); *Gerow,* 192 Ariz. at 18 ¶ 40.  Given that unconsented disposition of community assets may or may not be a breach, we next consider the parties' arguments as to whether a breach occurred here.

### B. Wife's and Husband's Positions Fail to Resolve Whether the Transfer to Teegardin Was a Breach of Fiduciary Duties.

¶20 Wife argues that the transfer to Teegardin was gratuitous — a gift that was not a business decision, as the superior court found, and thus by its nature, waste that violated his fiduciary duties. Husband argues that he did not act in bad faith to defraud the marital community, as A.R.S. § 44-1004 prohibits. Husband argues that even though the superior court did not reference that statute, *Gerow* and *Mezey* both applied it, making it the standard for resolution of Wife's claim that he improperly disposed of the shares of VIP he transferred to Teegardin. Husband claims that because the superior court did not find that he had the "actual intent to hinder, delay, or defraud," *see* A.R.S. § 44-1004(A)(1), his transfer to Teegardin could not have violated his fiduciary duties. We reject both parties' positions.

### 1. Wife's Position: The "Gift" Fallacy

¶21 Wife's position that unconsented substantial transfers of community assets are gifts that automatically violate Husband's marital fiduciary duties fails for three reasons.

¶22 *First*, in Wife's authorities, the transfers benefited one spouse to the detriment of the other. *Mezey*, 204 Ariz. at 607, 609 ¶¶ 32, 41 (husband gave his mistress cash and gifts bought with community funds); *Gerow,* 192 Ariz. at 18 ¶ 40 (husband took goodwill from a community business and opened a competing business in a relative's name without compensating the community); *Roselli v. Rio Communities Serv. Station, Inc.,* 787 P.2d 428, 433 (N.M. 1990) (in considering whether a spouse's transfer of community property to himself violated the fiduciary duty, the court should consider "intervening equities"); *Wright v. Wright,* 280 S.W.3d 901, 909 (Tex. App. 2009) (court reviewed considerable evidence that husband transferred community assets in trying to deprive wife of their use and enjoyment); 15B Am. Jur. 2d *Cmty. Prop.* § 64 (2023) (holding spouses owe a fiduciary duty they can breach by "improper" dissipation of community property). Even if the transfer to Teegardin was imprudent, the court did not find it was for Husband's benefit, nor does our review of the record suggest that it was. Nor does the record support a finding that the transfer was detrimental to Wife.

¶23 *Second*, Wife's argument overemphasizes the gift concept until it obscures the question of whether a transfer is a violation of fiduciary duties. Her brief heavily emphasizes the assertedly gratuitous nature of the

transfer of shares to Teegardin, treating it as necessarily answering the question as to whether the transfer harmed Wife. Wife's theory fails in part because it cannot account for transfers of shares in comparable cases that benefit the business and in turn enrich the community. In other words, if an unconsented gift of shares to Teegardin resulted in Teegardin remaining with VIP and growing the business to new heights that benefitted both Husband and Wife, there would be no fiduciary breach. Wife's authorities suggest injury to her is necessary to constitute a fiduciary breach. In short, labeling a transfer a "gift" does not make the transfer injurious to Wife.

¶24 *Third,* Wife's answer to this logic also fails. She argues the superior court found as a factual matter that the transfer to Teegardin was a gift and that Husband failed to object to that finding. So, Wife reasons, Husband is stuck with the legal consequences Wife suggests flow from the designation of the transfer as a "gift." The finding upon which Wife's argument rests is that "[t]he gifting of shares to Keith in 2014 did not represent a 'business judgment' related to VIP's management." Yet that finding does not support the outcome Wife seeks, because the court made contrary findings that demonstrate the business purpose of the transfer. The court overrode Wife's evidentiary objections and found that Husband and Teegardin drafted a "business plan" under which Teegardin would acquire ownership of shares in VIP. The court likewise credited Husband's testimony that Teegardin's contributions were a but-for cause of VIP surviving the subprime mortgage crisis of 2007, making Teegardin a but-for cause of the $88 million value of the business. The court also found that Wife conditionally consented to the 31% transfer to Teegardin in 2014, and that she asked for other changes to VIP's management documents — but not to Teegardin's 31% ownership share — over the next four years. These factual findings are consistent with Wife's insistence that she never legally consented to the transfer, but they cannot be reconciled with the assertion that giving Teegardin 31% was "not a business judgment related to VIP's management."

¶25 The court's thorough findings of fact demonstrate Husband granted shares to Teegardin for business purposes long recognized by Husband and Teegardin (and implicitly by Wife as well). To the extent the court simultaneously found the transaction had no business purpose whatsoever, it is an abuse of discretion to which we cannot defer.

¶26 For all of these reasons, we reject Wife's position that labeling the transaction as a gift that is not a business decision requires viewing it as a breach of fiduciary duties. And to the extent the superior court made a factual finding that the transfer was a gift that was not a business decision,

we reverse any such finding as an abuse of discretion given the contrary findings that render it insupportable. The right question, as we explain further below in Paragraphs 31–35, is whether the transfer, considered as a business transaction, violated Husband's fiduciary duties to Wife.

### 2. Husband's Position: The "Good Faith" Fallacy

¶27 Husband contends he did not violate his fiduciary duties to Wife because the transfer to Teegardin did not violate A.R.S. § 44-1004(A). This argument fails because it misreads and asks us to overextend *Gerow* and *Mezey*.

¶28 *Gerow* clearly separates its analysis of fraudulent conveyance and breach of fiduciary duty. There, a husband transferred goodwill and other intangible assets of a business that was community property without notice to his wife before a divorce. 192 Ariz. at 15 ¶ 26. The superior court separately found a fraudulent conveyance and a breach of fiduciary duties, 192 Ariz. at 15 ¶ 26 and we affirmed those findings, likewise parsing the issues separately. *Id.* at 17 ¶¶ 33–36 (affirming finding of fraudulent conveyance under A.R.S. § 44-1004); *id.* at 18 ¶¶ 37–40 (affirming finding of breach of fiduciary duty).

¶29 In *Mezey*, we affirmed an ex-wife's judgment for conversion against her ex-husband's mistress where the ex-husband concealed transfers of property and monies to the mistress for which he received no consideration, and which were made in furtherance of divorce. 204 Ariz. at 608 ¶ 41. The superior court held those concealed transfers of property were fraudulent in violation of A.R.S. § 44-1004(A), a conclusion we also affirmed. Our decision in *Mezey* repeats that spouses owe each other fiduciary duties in the management of community assets, but it does not explain the relationship of A.R.S. § 44-1004(A) to the spousal duty to act as a fiduciary of the community. While the existence of a fraudulent transfer is sufficient to demonstrate a breach of fiduciary duty, it does not follow (as Husband's briefing suggests) that the absence of a fraudulent transfer affirmatively demonstrates that Husband breached no fiduciary duty to Wife.

¶30 As *Gerow* and *Mezey* correctly suggest, the fact that the superior court did not find that Husband fraudulently transferred the VIP shares to Teegardin does not immunize Husband from a claim that he violated fiduciary duties to Wife through the transfer. We therefore reject Husband's argument that there was a no breach of fiduciary duty because he did not violate A.R.S. § 44-1004.

### C. The Criteria for Determining Whether Giving Teegardin a 31% Stake in VIP Violated Fiduciary Duties

¶31 Upon remand, the superior court must determine whether the transfer to Teegardin violated Husband's fiduciary duties. We have already explained what does *not* conclusively resolve the question: Wife's non-consent, labeling the transaction as a gift, and pointing out the transfer was not held fraudulent. So on to what does answer the question. First, the superior court should consider the criteria for fiduciary breach within community property businesses suggested by *Gerow* and *Mezey*. Second, given Husband's operational control over VIP, the superior court should also consider whether Husband breached fiduciary duties in the way a managing member of a corporation may breach duties to a non-managing member. We explain those distinct inquiries next.

#### 1. Whether the Transfer of Shares to Teegardin Bore the Indicia of Fiduciary Breaches in *Gerow* and *Mezey*

¶32 While *Gerow* and *Mezey* do not provide the only instances of fiduciary breaches in the context of businesses that are community property, and their facts do not furnish clean rules, they are our leading cases and are instructive. Thus, the superior court should consider whether Husband's conduct bore the indicia of fiduciary breaches that were present in *Gerow* and *Mezey*. These include whether: (1) Wife lacked notice of the transfer to Teegardin; (2) Wife took affirmative steps to block the transfer to Teegardin, or instead acquiesced in it; (3) Husband's transfer to Teegardin was "divorce planning"; (4) Husband was economically benefited by the transfer; and (5) the amount of the transfer was so great as to be unfair in light of Teegardin's past, then-current, and anticipated contributions. *See Mezey*, 204 Ariz. 599; *Gerow*, 192 Ariz. 9. Additionally, the court should consider whether through the transfer to Teegardin, Husband retained a benefit to the detriment of Wife, which is impermissible. *See Zork Hardware Co. v. Gottleib,* 170 Ariz. 5, 6 (App. 1991) (one spouse may not convert a separate debt into a community obligation). Taking these factors as a whole, the superior court should determine whether they indicate Husband has breached fiduciary duties to Wife.

#### 2. Whether the Transfer of Shares to Teegardin Breached Husband's Fiduciary Duties of Care and Loyalty

¶33 But the inquiry does not end with the above. Wife is not only Husband's spouse, but also his business partner. Thus, while the above factors sound in Arizona's law of community property, they are not the

only way to show Husband breached fiduciary duties to Wife. Given Wife's status as half-owner of VIP through the marital community, Wife can also establish a breach of fiduciary duties by showing Husband's decision to provide Teegardin a 31% stake in VIP in 2014 failed to comply with his duties of care and loyalty as a manager of VIP. *Shoen v. Shoen*, 167 Ariz. 58, 65 (App. 1990) ("[A] board member's obligation to the corporation and its shareholders involves a duty of care and a duty of loyalty. The duty of care refers to the responsibility to exercise the care that a reasonably prudent person in a similar position would exercise under similar circumstances."). If Husband did not breach duties of care and loyalty as a corporate manager in making the transfer to Teegardin, then the transfer was not just a business decision, as the court's other findings indicate, but was a defensible business decision. In that case, it cannot be shoehorned into the rule we approved in *Mezey*, that "absent intervening equities, a gift of substantial community property to a third person without the other spouse's consent may be revoked and set aside for the benefit of the aggrieved spouse." 204 Ariz. at 608 ¶ 38.

¶34            On remand, the inquiry into whether the Teegardin transfer violated duties of care and loyalty includes, but is not limited to, considering "the value the community received as a result of the 2014 transfer," which the superior court did. Because the court's findings of fact demonstrate that the transfer to Teegardin was a business decision, the court must determine its prudence and loyalty in the total context of that business decision. That context necessarily includes Teegardin's then-past, current, and anticipated contributions, any past plans to make Teegardin a part owner by VIP's manager (Husband) that led Teegardin to create value for the community business, and any later conduct of Wife that reflected agreement (as shareholder or otherwise) that Teegardin's shares were properly granted so long as she took half of what remained.

¶35            We therefore reverse the order that Wife is entitled to an equalization payment worth 48.835% of VIP's value, and the order awarding Wife 48.835% interest in two other entities, Barbour Teegardin, LLC, and Inventive Technologies, LLC. On remand, the court must determine whether Husband breached a fiduciary duty in light of the foregoing standards. If not, the court must divide the remaining interest in VIP equitably among Husband and Wife.

## II.      Husband's Admissions Constitute a Prima Facie Case of Waste.

¶36            Courts may consider a spouse's excessive or abnormal expenditures of community assets, *i.e.*, waste, when apportioning

community property. *See* A.R.S. § 25-318(C); *Gutierrez v. Gutierrez*, 193 Ariz. 343, 346 ¶ 6 (App. 1998). If the spouse alleging waste makes a prima facie case, the burden shifts to the spending spouse to show a benefit to the community. *Id.* at 346 ¶¶ 6–7. We review the superior court's determination that there is sufficient evidence for a prima facie case under an abuse of discretion standard. *Kline v. Kline*, 221 Ariz. 564, 573 ¶ 35 (App. 2009).

¶37 Wife asserted that Husband spent significant community funds on extramarital affairs and other activities that did not benefit the community. Specifically, she alleged his cash withdrawals totaling over $500,000 constitute waste. At his deposition, Husband admitted this. In fact, he provided a spreadsheet estimating that he spent nearly $1 million on sex workers, strip clubs, and extramarital affairs. Some of those funds came from Husband's cash withdrawals.

¶38 The superior court found that together with the $158,600 cash Husband admittedly spent on an affair, Wife showed that he could not account for $371,978 in cash withdrawals. The court determined that Wife made a prima facie case for waste and that Husband did not rebut this by showing he used the cash to benefit the community.

¶39 Husband argues that the superior court erred when it found Wife met her prima facie case by simply adding up twelve years of ATM withdrawals. But that is not what the court did. Wife alleged a prima facie case of waste based on Husband's own estimate of non-community expenses. From that starting point, Wife showed there were over $500,000 in cash withdrawals that Husband could not explain. She also relied on Husband's deposition testimony that he spent considerable money on sex workers and affairs.

¶40 A prima facie case requires evidence to support a rational inference that the allegation is true. *See Kline,* 221 Ariz. at 573 ¶ 35; *see also State v. Speerschneider,* 25 Ariz. App. 340, 343 (1975) (defining prima facie as "sufficient evidence to permit the trial court to reasonably infer" a fact). Wife alleged Husband spent over $500,000 on activities that did not benefit the community based, in part, on his unexplained cash withdrawals. Husband's own testimony supports a rational inference that over $500,000 in unexplained cash withdrawals were not for the benefit of the community. Wife thus made a prima facie case of waste.

¶41 Husband then had the burden to show what amount benefited the community. Husband misdescribed the burden of proof by

asserting that Wife must show that each individual withdrawal constituted waste. To be sure, if Husband had not admitted to spending that amount of money on these non-community activities, Wife would have had to show more detailed information. But Husband essentially conceded that the spending at issue was both excessive and abnormal. Wife's evidence showed he paid for these things, in part, with cash withdrawals. As the court pointed out, Husband "failed to specifically or adequately explain his use of such significant sums of cash."

¶42 On appeal, Husband does not point to any evidence that he used this cash for community purposes. Reasonable evidence supports the court's findings on this issue, and we will not reweigh it on appeal. *Lehn v. Al-Thanayyan*, 246 Ariz. 277, 284 ¶ 20 (App. 2019) ("On appeal, we do not reweigh the evidence but defer to the family court's determinations of witness credibility and the weight given to conflicting evidence."). Therefore, we affirm the waste ruling.

## ATTORNEYS' FEES ON APPEAL

¶43 Both parties request an award of attorneys' fees and costs on appeal under A.R.S. § 25-324. In the exercise of our discretion, after considering the reasonableness of the parties' positions and their financial resources, we decline to award attorneys' fees on appeal. Both parties prevailed in part, so we do not award costs under A.R.S. § 12-342.

## CONCLUSION

¶44 We reverse the order that Wife is entitled to an equalization payment worth 48.835% of VIP's value. On remand, the court shall determine whether there is a breach of fiduciary duty and make such rulings as are necessary to allocate the community's interests appropriately. We affirm the waste ruling.

