

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00232-CV

**CHAMPION FOOD SERVICE, INC.** and Champion Food Service 2, Inc.,
Appellants

v.

**PROALAMO FOODS, L.L.C.** and ProCoastal, L.L.C.,
Appellees

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2019-CI-10530
Honorable Antonia Arteaga, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice
Concurring & Dissenting Opinion by: Rebeca C. Martinez, Chief Justice

Sitting:      Rebeca C. Martinez, Chief Justice
           Liza A. Rodriguez, Justice
           Lori I. Valenzuela, Justice

Delivered and Filed: December 11, 2024

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

Champion Food Service, Inc. ("Champion 1") and Champion Food Service 2, Inc. ("Champion 2"), collectively "Champion," appeal from a final judgment after a jury trial that awards damages to ProAlamo Foods, LLC ("ProAlamo") and ProCoastal, LLC ("ProCoastal"), collectively "the Pro Parties." On appeal, Champion brings several issues. First, Champion argues the trial court erred in charging the jury on the Pro Parties' quantum meruit claim and in rendering

judgment in favor of the Pro Parties on that claim. Second, Champion argues the trial court erred in granting judgment notwithstanding the verdict and awarding the Pro Parties attorneys' fees through trial and conditional fees related to any appeal. Third, Champion argues the trial court erred in re-opening the evidence and awarding the Pro Parties additional post-verdict attorneys' fees related to the filing of the Pro Parties' motion for JNOV. Fourth, Champion argues the trial court erred in awarding the Pro Parties costs and interest. Fifth, Champion argues the trial court erred in granting directed verdict on its counterclaims for violations of the DTPA and breach of implied warranty. Sixth, Champion argues the jury's finding of zero dollars in relation to its breach of contract claim is against the great weight and preponderance of the evidence. Seventh, Champion argues the trial court erred in excluding three of its exhibits. Because we agree the trial court erred in re-opening the evidence and awarding additional post-verdict attorney's fees relating to the Pro Parties' filing of its motion for JNOV, we reverse the trial court's February 18, 2022 order. We affirm the trial court's judgment of February 11, 2022.

## BACKGROUND

The Pro Parties and Champion are food distributors. The Pro Parties sold frozen and pre-sealed meat products to Champion. Each time the Pro Parties sold meat products to Champion, it sent Champion an invoice for payment of the meat products in question. Thus, there is not one contract or agreement that governs the sales between the parties. Instead, the Pro Parties sent many invoices to Champion, and those invoices related to many different meat products. The invoices stated that Champion had seven days from receipt of the meat products to make payment.

In the underlying lawsuit, the Pro Parties sued Champion for breach of contract and quantum meruit, alleging that Champion had failed to pay all amounts owed for meat products

sold in 2018.[1] Champion countersued for breach of contract, breach of implied warranty, promissory estoppel, fraud, fraud by nondisclosure, negligent failure to disclose, and violation of the Texas Deceptive Trade Practices Act ("DTPA"), alleging that the Pro Parties sold defective frozen meat products to Champion. All parties sought attorneys' fees, and the case proceeded to a jury trial. At trial, the Pro Parties nonsuited their claims against Champion 2.

At trial, Carlos Garcia, the warehouse manager for the Pro Parties, testified that the Pro Parties receive meat products from food processors. Those meat products are already packaged, vacuum-sealed and placed into a box that is "kind of super glued shut." Garcia testified he inspects incoming shipments for quality but does not look at "every single box." According to Garcia, when inspecting shipments, he looked at "the tail end, the nose end, which is the front or the back end of the trailer" and then randomly opened boxes and inspected the meat products, including taking the temperature of the products. Garcia testified that when inspecting the meat products, "it's pretty easy to see if there's any leakers" of blood, which means that "the plastic wrap around the piece of meat . . . loses its vacuum seal and it will start to drain some blood." Garcia testified that "it's very easy to see that on the boxes." Garcia also looked for "freezer burn on the products" or "any type of discoloration."

Margie Cavazos, the general manager of the Pro Parties, testified that the meat products in question came from Sam Kane Beef processors to the Pro Parties' storage facility. She testified that the Pro Parties ensured the meat products from Sam Kane Beef processors were good by checking each pallet to ensure each box was sealed with "no leakage." Further, she explained that before the meat products left Sam Kane Beef processors, they were inspected by dock workers at Sam Kane and an inspector with the United States Department of Agriculture. With respect to

---

[1]The Pro Parties also sued Champion for fraud but nonsuited that claim before trial.

every shipment the Pro Parties sent to Champion, Cavazos testified that she personally inspected the boxes containing the meat products to ensure there was no "leakage of any sort." According to Cavazos, when the meat products were loaded onto the trucks, they went directly to Champion.

Champion's owner, Pasadena Ayala, acknowledged that he signed the delivery invoices for the meat products in question. According to Ayala, Champion received the frozen and pre-sealed meat products from the Pro Parties and stored the meat products in its own freezers. Champion then sold the meat products to customers who operate restaurants and grocery stores. Some of the meat products were immediately sold to Champion's customers due to high demand. Other meat products with lower demand were stored in Champion's freezers for longer periods of time before being sold to customers.

Champion's employees do not open and inspect the meat products before shipping them to Champion's customers. Ayala testified that the meat products in question did not have a noticeable smell or appearance because they were frozen and sealed. One of Champion's customers, Angel Lubian, testified that he bought frozen and sealed tripas from Champion. Lubian testified he wanted the meat products he purchased to be "[t]otally sealed" because he would not "buy a box that is open for [his] own safety." Lubian testified that it was not until he thawed the meat products that he noticed they were spoiled. Ayala testified that it was not until his customers complained about the meat products that he learned they were spoiled. Ayala also testified that Champion gave credits to its customers for the spoiled meat and has been unable to sell approximately 102 boxes of spoiled meat received from the Pro Parties and held in its freezers.

Champion alleged that it notified the Pro Parties about the alleged rotten meat products as soon as it learned of the spoiled meat from its customers. Ayala testified that with respect to the first order Champion placed with ProCoastal on July 26, 2018, Champion received meat products,

sold them to customers, and discovered "a few days later" from its customers that the meat was spoiled. Ayala testified that ProCoastal discounted the meat products from $1.35 to $0.30. According to Ayala, with respect to that first shipment, ProCoastal "assume[d] the loss of everything that I sent them back," as shown in a picture taken by Ayala. Ayala testified that Champion continued to buy meat products from the Pro Parties. According to Ayala,

> There were a lot of problems. When they told me to make the payments of the things that were not spoiled, and that later on they were going to give [Champion] credit, and then we would fix everything, so I noticed that there was an order that was okay and an order that was bad, one okay, one bad. And it's in statements, there was a good order or an order that came okay and it was paid, then another one that was not okay, it wasn't paid.

During Ayala's testimony, he was unable to specify *when exactly* he notified the Pro Parties of the alleged spoiled meat products at issue:

> Q: Sir, you didn't notify ProCoastal or ProAlamo immediately about any product that you didn't think was the right quality, correct?
>
> A: Yes, I did notify.
>
> Q: When did you do that, sir?
>
> A: Right away. After I noticed. After the customers start complaining. What do I need to do to receive credits after four days—four days after receiving the product.
>
> Court: I'm sorry. The question was: When did you do that, sir? Could you be more—clarify your question.
>
> Pro Parties: Yes.
>
> Court: Are you asking for a date?
>
> Pro Parties: I am, I am. Yes, ma'am.
>
> Q: Sir, I'm asking when exactly did you do that? Tell us a date that you did that.
>
> A: I don't have one date. I don't have a date. It was several times.

Q: So you can't even remember a single date when you said you contacted ProAlamo or ProCoastal about any products, right?

A: I think that if [sic] that's three years ago? I can tell you that. I don't remember.

Ayala testified that the Pro Parties had promised to give Champion credit for the spoiled meat but failed to do so. According to Ayala, Champion was making payments to the Pro Parties but a check was returned for insufficient funds. Ayala testified that Champion was having "cash flow" problems because it "had a lot of issues with the product, and a lot of clients . . . stopped buying because of the bad meat from ProCoastal and ProAlamo." After the check was returned, Champion sent another payment for $10,000.00. Ayala testified that when the Pro Parties did not apply credits for the meat products in dispute, Champion stopped making payments.

The Pro Parties presented evidence that ProCoastal invoiced $102,443.27 to Champion and Champion paid only $78,205.23. Thus, Champion failed to pay ProCoastal $16,768.84. ProAlamo invoiced Champion a total amount of $66,284.11, and of that amount, Champion paid $10,000 and thus still owed ProAlamo $56,284.11. The total amount owed to the Pro Parties was $73,052.95. Cavazos testified that she sought payment from Champion on the amounts owed. She testified that the last time Champion would have received meat products from the Pro Parties was either late November or early December 2018. She testified that no one from Champion ever said that the meat products were spoiled until four or five months after the last delivery of the meat products. Cavazos testified that as a general practice, her customers use meat products within two to three weeks. She had never had a customer tell her that a meat product was spoiled "after such a long time." Cavazos testified the industry standard for reporting a bad product from the manufacturer or distributor is "normally" twenty-four hours.

According to the Pro Parties' warehouse manager Garcia, when a customer finds a problem with a product sold by the Pro Parties, the Pro Parties will credit the customer and then seek their

own credit from the food processor. When asked how long after delivery the Pro Parties would accept that kind of complaint about a product, Garcia answered,

> So, I mean, there's some leeway there. There's some time for them to actually inspect the product and go through it. And as far as once we've left, I mean, within reason, a day, two, maybe three days. You know, hey, we came across this mispack. No problem. You know, it happens. You know, we'll issue the credit. But in my experience, it's never more than a couple of days.

Like Cavazos, Garcia testified that Champion did not start complaining about the meat products until the Pro Parties pressured Champion to pay the invoices, which was about "four or five months after the fact."

Cavazos further testified that pictures of the spoiled meat products sent by Champion did not have the Pro Parties' stickers on the boxes. Noting that many distributors sell Sam Kane Beef, Cavazos testified that she did not believe the meat in question was distributed by the Pro Parties. Cavazos further noted that the meat products in the pictures looked like they were "freezer burned," which she testified was "probably a storage issue" with Champion.

The Pro Parties' expert Ruben Hinojosa, Jr. testified as an industry expert. Hinojosa testified about how the industry is highly regulated by the USDA and how the USDA inspects meat products during each process of meat processing and distribution. He testified that the Pro Parties' facility is a "federally inspected facility" and explained how the USDA inspects the freezers with random walkthroughs. Hinojosa described the Pro Parties' procedures for inspecting the boxes delivered by food processors and for monitoring its freezers, which he characterized as "excellent."

After reviewing Champion's cooler and freezer temperature monitoring document, Hinojosa criticized Champion's practice. He testified that the document reflects Champion did not monitor the temperature of its freezers consistently. He explained,

> If you go back [to] this exhibit by chronological dates, you're going to see that they [employees at Champion] don't take temperatures. There's dates that are skipped in between. And, it's—sometimes its Sunday they take the temperature. Sometimes it's Monday. And then they take the temperature on Wednesday. The only consistency of this document is its inconsistency as far as taking temperatures on a daily basis.

Hinojosa noted that sometimes a couple of days were missing temperature readings. He testified that daily checks of cooler and freezer temperatures were essential because "[s]omething can go terribly wrong in a day." He also criticized the varied temperature readings of Champion's freezer which at times showed "a huge temperature gap." Hinojosa explained Champion's readings showed a "[h]uge difference" in temperatures between Champion's freezer and refrigerator. He testified that the skipped dates in Champion's readings and the temperature variations indicated that there is a "huge possibility of some kind of temperature abuse and product could thaw and spoil." Hinojosa testified that in his expert opinion, Champion's recordkeeping was "very poor" and its quality control "would be a violation of th[e] HACCP program." Hinojosa further noted that there was a four-month gap in Champion's records during the time period Champion argued the meat products were spoiled. In looking at Champion's procedures and practices, Hinojosa testified, "That's not a surprise at all."

Hinojosa testified that under industry standards, once a customer signs for the delivery, he has "one to two days" to report any problems with the meat products delivered. Hinojosa explained that food distributors will not credit for bad product after one or two days because they will not in turn receive credit from the food processors. Hinojosa testified,

> [T]he people [whom the food distributors] buy from have very strict rules on how [the food distributors] can return product. And once the big boys, the JBSs, the Tysons of the world, once they sell you product and their guy is gone, it's real hard to get a credit from the big boys. They just don't do it. Hey, the product's been out of our control. You signed for it. You know, it's yours.

When asked if it would be the industry standard for a customer receiving product to store the product for months before notifying the food distributor there was an issue, Hinojosa replied, "That is not an accepted industry practice." When asked specifically about five months, Hinojosa testified that five months is "[t]oo long to wait." He explained that the product would have been too long out of the control of the food distributor who would not know how the product had been handled. "That's just not an accepted practice."

After both sides rested and closed, the trial court granted directed verdicts as to Champion's claims for DTPA, promissory estoppel, breach of implied warranty, fraud, fraud by disclosure, and negligent failure to disclose. The Pro Parties' breach of contract and quantum meruit claims were submitted to the jury, along with Champion's breach of contract claim.

Question No. 1 asked the jury whether Champion failed to comply with "the agreements" to pay the Pro Parties for the meat products provided. The jury answered "No." Question No. 2 was conditioned on an affirmative response to Question No. 1 and was thus not answered by the jury. Question No. 3 asked the jury whether the Pro Parties performed compensable work for Champion for which the Pro Parties were not compensated. The jury answered "Yes." Question No. 4 asked the jury to determine the reasonable value for the meat products provided by the Pro Parties but not paid for by Champion. The jury answered $46,396.58.[2] Question No. 5 asked the jury to determine the reasonable fee for the necessary services of the Pro Parties' attorneys in this case. The jury answered "$0." Question No. 6 asked the jury whether the Pro Parties failed to comply with "the agreement." The jury answered "Yes." Question No. 7 asked the jury to determine what sum of money, if any, would fairly and reasonably compensate Champion for its damages, if any, that resulted from the Pro Parties' failure to comply with the agreement. The jury

---

[2]The Pro Parties had argued to the jury that they were owed $73,052.95 by Champion. Thus, the jury did not award the Pro Parties the total amount requested.

answered "$0." After the jury returned its verdict, Champion did not object to the jury returning conflicting answers. The jury was released.

Post-trial, the Pro Parties moved to disregard the jury findings and for JNOV, requesting, in part, the trial court to disregard the jury's zero-dollar answer to the Pro Parties' request for attorneys' fees and to award them the full amount of their requested attorneys' fees.[3] Champion also filed a motion to disregard the jury findings and for judgment notwithstanding the verdict. The trial court granted the Pro Parties' motion for judgment notwithstanding the verdict as to attorneys' fees.

In its final judgment signed February 11, 2022, the trial court found that the Pro Parties prevailed on their quantum meruit claim but did not prevail on their breach of contract claim against Champion. The trial court also found that Champion did not prevail on its claims for breach of contract, DTPA, fraud, promissory estoppel, negligent failure to disclose, and breach of implied warranty. The trial court rendered judgment for the Pro Parties on their claim for quantum meruit, awarding the Pro Parties $46,396.58 in actual damages. The trial court awarded the Pro Parties attorneys' fees in the following amounts: (1) $219,674.00 in fees for trial; (2) $32,000.00 in conditional appellate fees for an appeal to the court of appeals; (3) $10,000.00 in conditional fees for opposing a petition for review before the supreme court; (4) $20,000.00 in conditional fees for any merits briefing before the supreme court; and (5) $8,000.00 in conditional fees for any oral argument and completion of proceedings before the supreme court. The trial court further rendered judgment that Champion take nothing on its claims for breach of contract, DTPA, fraud, promissory estoppel, negligent failure to disclose, and breach of implied warranty.

---

[3]With respect to damages on their quantum meruit claim, the Pro Parties requested the trial court to disregard the jury's answer and award them the full amount they requested–$73,052.95. The trial court denied this part of the Pro Parties' motion.

The Pro Parties sought additional post-verdict attorney's fees for work related to the Pro Parties' motion for JNOV. In a separate order dated February 18, 2022, the trial court granted the Pro Parties' motion and awarded additional post-verdict attorneys' fees in the amount of $9,386.00. Champion then filed a Motion to Modify, Correct, or Reform Judgment and/or Motion for New Trial, which was overruled by operation of law. This appeal followed.

### THE PRO PARTIES' QUANTUM MERUIT CLAIM

In its first issue, Champion argues the trial court erred in charging the jury on the Pro Parties' quantum meruit claim and in rendering judgment in favor of the Pro Parties. "Quantum meruit is an equitable remedy that is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding) (citation omitted). "A party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished." *Id*.

Champion argues that pursuant to Texas Rule of Civil Procedure 279, the trial court in this case made a deemed finding that a valid express contract existed between the parties. In making this assertion, Champion argues that by asking the jury whether Champion failed to comply with the agreement to pay the Pro Parties for the meat products provided, Question No. 1 assumed there was a valid contract. Champion points out that it objected to Question No. 1 on the basis that there was "no predicate question with respect to the agreement or its terms." Further, Champion contends that Question No. 3, the Pro Parties' quantum meruit question, was not conditioned on the jury finding first that there was not a valid contract. Champion points out that it also objected to Question No. 3 on the basis of there not being a "predicate question to the contract issue." According to Champion, by overruling its objections to Questions No.1 and No. 3, the trial court made a deemed finding pursuant to rule 279 that there was a valid contract between the parties.

Champion further argues that because one cannot recover under quantum meruit when a valid contract exists, the final judgment improperly allows the Pro Parties to recover in quantum meruit despite the trial court having made a deemed finding that a valid express agreement existed.[4]

In response, the Pro Parties argue that Rule 279 does not apply here, explaining that Rule 279 requires the ground of recovery to be "found by the jury." TEX. R. CIV. P. 279. The Pro Parties emphasize that the jury did not find in favor of them on their breach of contract claim; thus, there cannot be a deemed finding pursuant to rule 279 that a contract covered the meat products at issue. Further, the Pro Parties argue the record does not reflect that the trial court made a deemed finding that a contract covered the meat products at issue. The Pro Parties note that the record shows that the trial court was aware of the law that a party cannot recover in quantum meruit if an express contract governs. Nevertheless, the trial court here included the quantum meruit claim in the jury charge. The Pro Parties point out the trial court would not have submitted the quantum meruit question had it made a deemed finding that a contract governed.

Finally, the Pro Parties stress that the jury finding "that Champion was liable for fewer than the value of the amount of products claimed by the Pro Parties further supports that a contract may have covered some of the products at issue but that the $46,396.58 found by the jury was not part of an oral agreement between the parties." Indeed, the evidence in this case showed that the parties were not governed by one all-encompassing contract of the meat products in question. Instead, the evidence reflected that Champion placed many different orders for meat products and that the Pro Parties sent many different invoices for them. According to the Pro Parties, "the jury was properly charged with determining whether the meat the Pro Parties delivered to Champion were covered

---

[4]We note that Champion expressly states in its briefing that it is not appealing based on conflicting jury answers. Champion did not object to the jury returning conflicting answers before the jury was released. Thus, any such issue would be waived on appeal.

by an agreement such that a quantum meruit charge was not erroneous." The Pro Parties contend that "[f]ollowing the charge, the jury appropriately resolved that factual dispute based on the evidence presented" and concluded that under quantum meruit, Champion was liable for $46,396.58.

Texas Rule of Civil Procedure 279. Rule 279, titled "Omissions From the Charge," states the following:

> Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived. When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to *and found by the jury*, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment. If no such written findings are made, *such omitted element or elements shall be deemed found by the court in such manner as to support the judgment*. A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict, regardless of whether the submission of such question was requested by the complainant.

Tex. R. Civ. P. 279 (emphasis added). By its plain language, Rule 279 applies when a ground of recovery is "found by the jury." *See id*. Here, the jury did not find in favor of the Pro Parties on Question No. 1's breach of contract claim, and the trial court did not render judgment on that basis. Thus, there can be no deemed finding by the trial court pursuant to Rule 279. *See Gulf States Utilities Co. v. Low*, 79 S.W.3d 561, 564 (Tex. 2002) (explaining that Rule 279 "may support a deemed finding only when it can be deemed found 'in such manner as to support the judgment'").

We note that Champion cites *Free v. Lewis*, No. 13-11-00113-CV, 2012 WL 3242090, at *8 (Tex. App.—Corpus Christi-Edinburg Aug. 9, 2012, no pet.), in support of its argument that Rule 279 applies. However, *Free* is distinguishable from the facts presented here. The jury in *Free*

was asked whether the appellant failed to comply with a restitution agreement and answered in the affirmative. *Id*. at \*8. The court of appeals noted that "the ground of recovery challenged by [the appellant], breach of contract contains more than one element." *Id*. "One of those elements, breach" "was submitted and found by the jury." *Id*. Because "[n]o objection was lodged at the charge conference to the lack of a question on enforceability" and the "trial court did not make written findings as to the omitted element," "Rule 279 directs us [the court of appeals] to deem the omitted element to be found 'in such manner *as to support the judgment*.'" *Id*. (quoting TEX. R. CIV. P. 279) (emphasis added). Here, however, the jury did not answer Question No. 1, the breach of contract question, in the affirmative, and the trial court did not render judgment on the breach of contract claim. Thus, *Free* does not support Champion's argument.

Champion next argues that the "trial court's deemed finding that express contracts existed between the Pro Parties and Champion precluded the trial court from submitting Question Nos. 3 and 4 relat[ing] to the Pro Parties' quantum meruit claims as a matter of law." Because the trial court made no such deemed finding that express contracts existed, the trial court did not err in submitting Questions Nos. 3 and 4 on this basis.

Finally, Champion argues that "the trial court's finding that valid contracts existed further barred the rendition of a judgment on Questions Nos. 3 and 4 concerning quantum meruit because those claims arose from the delivery of the same meat products." Once again, the trial court did not make a deemed finding that express contracts existed. In support of this argument, Champion cites *Hutch Aviation, Inc. v. Teal*, No. 12-19-00001-CV, 2019 WL 5258068, at \*4 (Tex. App.—Tyler Oct. 17, 2019, pet. denied), arguing that *Hutch Aviation* stands for the proposition that "because [the] plaintiff proved an express contract, it could not recover under quantum meruit even when the jury answered quantum meruit questions in the plaintiff's favor." *Hutch Aviation* is

distinguishable from the facts presented here because the jury in *Hutch Aviation* found in favor of the plaintiff on both breach of contract and quantum meruit theories. *Id*. at 1. The court of appeals held that "the trial court properly disregarded the jury's findings regarding quantum meruit and entered judgment in accordance with the jury's contract findings." *Id*. at *4. Here, however, the jury did not find in favor of the Pro Parties on both breach of contract and quantum meruit theories. The jury found in favor of the Pro Parties only on quantum meruit. Thus, *Hutch Aviation* does not apply to the facts presented here.

Similarly, the other case cited by Champion, *Houston Med. Testing Servs., Inc. v. Mintzer*, 417 S.W.3d 691, 694 (Tex. App.—Houston [14th Dist.] 2013, no pet.), does not apply to the facts presented here as the jury in *Mintzer* also found that an express contract existed.

For the reasons stated above, we conclude Champion's arguments relating to its first issue have no merit and thus hold the trial court did not err in charging the jury on the Pro Parties' quantum meruit claim and in rendering judgment in their favor on that claim.

### THE PRO PARTIES' ATTORNEYS' FEE AWARD

In its second issue, Champion argues the trial court erred in granting a judgment notwithstanding the verdict and awarding the Pro Parties their attorneys' fees. The jury in this case found that the Pro Parties were entitled to monetary damages under quantum meruit. However, when asked in Question No. 5 what a reasonable fee would be for the necessary services of the Pro Parties' attorneys in this case, the jury answered "$0." Post-trial, the Pro Parties moved to disregard the jury's zero-dollar finding on attorneys' fees and for a judgment notwithstanding the verdict that awarded them attorneys' fees. The trial court granted the motion and awarded the Pro Parties' attorneys' fees. On appeal, Champion argues the trial court erred in granting judgment notwithstanding the verdict and awarding the Pro Parties attorneys' fees because (1) the Pro

Parties' claim for attorneys' fees "has no basis in law"; (2) the Pro Parties "failed to establish evidence of presentment"; and (3) there was evidence that supported the jury's zero-dollar award for attorneys' fees.

### A. Whether the award of attorneys' fees had a "basis in law"

First, Champion argues the Pro Parties pleaded recovery for attorneys' fees under chapter 38 of the Texas Civil Practice and Remedies Code and the jury found against the Pro Parties on their breach of contract claim. However, chapter 38 "allows the recovery of attorney's fee for a valid *quantum meruit* or contract claim." *Rainbow Grp., Ltd. v. Johnson*, No. 03-00-00559-CV, 2002 WL 1991141, at *9 (Tex. App.—Austin Aug. 30, 2002, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE §§ 38.001, .006). Thus, the Pro Parties could recover their attorneys' fee under quantum meruit. *See id*. Champion does not dispute that a party may recover attorneys' fees under quantum meruit, but instead argues that because the Pro Parties "were precluded as a matter of law from recovering under quantum meruit," there is no legal basis to support an award for attorneys' fees. As explained above, we have rejected the arguments by Champion that the Pro Parties were precluded as a matter of law from recovering under quantum meruit. Thus, we also reject this argument brought by Champion.

### B. Whether there was evidence of "presentment"

Second, Champion argues the Pro Parties failed "to establish evidence of presentment." Champion argues that under chapter 38, a party seeking attorney's fees "must plead and prove that it presented its claim to defendant." Champion noted that the purpose of this requirement is "to allow the person against whom a claim is asserted an opportunity to pay within thirty days of receiving the notice of the claim, without incurring an obligation for attorney's fees." *Sacks v. Hall*, 481 S.W.3d 238, 250 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see* TEX. CIV.

PRAC. & REM. CODE § 38.002. Champion argues that the Pro Parties failed to meet their burden of proving presentment and failure to tender performance. *See Sacks*, 481 S.W.3d at 250 (explaining that a party seeking attorneys' fees bears the burden to plead and prove presentment and failure to tender performance). In response, the Pro Parties argue that they pled all conditions precedent had been met pursuant to Texas Rule of Civil Procedure 54. Thus, they argue they did not need to present specific evidence of presentment.

Texas Rule of Civil Procedure 54 provides:

In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred. When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.

TEX. R. CIV. P. 54. Thus, if a plaintiff includes the Rule 54 allegation in its petition, it does not have to prove it complied with the conditions precedent unless the defendant alleges the plaintiff did not comply with certain specific requirements. *See id*. Here, the record reflects that the Pro Parties pled that "[a]ll conditions precedent to the Pro [Parties]' claims for relief have been performed or have occurred." The record also reflects that Champion did not assert failure of presentment in its answer. Accordingly, because the Pro Parties pled that all conditions precedent had been met and Champion did not specifically deny presentment, the Pro Parties were not obligated to produce specific evidence of presentment at trial. *See Belew v. Rector*, 202 S.W.3d 849, 857 (Tex. App.—Eastland 2006, no pet.) (holding that because (1) the party seeking attorney's fees pled that all conditions precedent had been met and (2) the opposing party did not "affirmatively deny presentment," the party who sought and was awarded attorney's fees at trial "was not obligated to produce specific evidence of presentment"); *Shin-Con Dev. Corp. v. I.P.*

*Invs.*, 270 S.W.3d 759, 768 (Tex. App.—Dallas 2008, pet. denied) (unchallenged Rule 54 allegation was sufficient to support attorney fees).

### C. *Whether there was evidence to support the jury's zero-dollar attorneys' fee award*

Third, Champion argues the trial court erred in granting the judgment notwithstanding the verdict and awarding the Pro Parties attorneys' fees because there was evidence to support the jury's zero-dollar attorneys' fee award. A trial court may disregard a jury's finding and grant a motion for judgment notwithstanding the verdict "if a directed verdict would have been proper." TEX. R. CIV. P. 301; *see also Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (explaining that a directed verdict is proper when the evidence conclusively establishes the right of movant to judgment or negates the right of an opponent, or when the evidence is insufficient to raise a material fact issue). Thus, a judgment notwithstanding the verdict should be granted when the evidence is conclusive and one party is entitled to recover as a matter of law, or when a legal principle precludes recovery. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see Morrell v. Finke*, 184 S.W.3d 257, 290 (Tex. App.—Fort Worth 2005, pet. denied); *see also United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 n.4 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("A court should grant a motion for judgment notwithstanding the verdict if a legal principle prevents a party from prevailing on its claim.").

We review a judgment notwithstanding the verdict under a no-evidence standard of review. *Bank of Am., N.A. v. Eisenhauer*, 474 S.W.3d 264, 265 (Tex. 2015). "We will uphold the jury's verdict if more than a scintilla of competent evidence supports it." *Id*. "To determine whether there is no evidence to support the jury's finding, 'we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary.'" *B*

*& W Supply*, 305 S.W.3d at 15 (quoting *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003)). "If more than a scintilla of evidence supports the jury's finding, 'the jury's verdict, and not the trial court's judgment must be upheld.'" *Id*. (quoting *Wal-Mart Stores*, 102 S.W.3d at 709).

In response to Champion's argument, the Pro Parties emphasize that the award of reasonable attorneys' fees to a plaintiff recovering on a valid claim of quantum meruit is mandatory under Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(b)(3) (authorizing attorneys' fees for claims based on furnished materials). They point out that once a jury finds in favor of a party on a claim for which attorneys' fees are mandated, the only question remaining is the reasonable value of the attorneys' fees, not whether they should be awarded. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex. App.—Tyler 2000, pet. denied). Thus, we must consider whether there is more than a scintilla of evidence to support the jury's zero-dollar award of attorneys' fees.

"As a factual matter, a zero award for attorney's fees would have been proper if the evidence: (1) failed to prove (a) that any attorney's services were provided; or (b) the value of the services provided; or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value." *Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 787 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Champion argues that it presented evidence challenging the necessity of the Pro Parties' lawsuit. Champion points to Pasadena Ayala's testimony that the Pro Parties promised to give Champion credit for the alleged spoiled meat, which is why Champion made a last payment of $10,000 to the Pro Parties. According to Ayala, "[W]e agreed for me to send a payment because they were going to talk to the owner so they can apply the credits." "The whole time they promised that they were going to give me the

credits." "We talked about that, and I mentioned to him about the product. And he told me to send the invoice related to that product." Champion never received the credit and was instead sued by the Pro Parties. In support of their argument they point to *Meek v. Onstad*, 430 S.W.3d 601 (Tex. App.—Houston [14th Dist.] 2014, no pet.). *Meek* involved a dispute between two lawyers over attorneys' fees. *Id*. at 603. At trial, the plaintiff recovered in quantum meruit but was not awarded attorney's fees. *Id*. The court of appeals concluded that the evidence was legally sufficient to support the jury's finding that a reasonable fee for the necessary services of the plaintiff's attorneys was zero dollars because there was "evidence affirmatively showing that no attorney's services were needed." *Id*. Specifically, the court of appeals explained that the plaintiff's "only basis for her recovery against [the defendant] [was] quantum meruit, and [the defendant] was willing to pay her the reasonable value of her services before she hired attorneys to prosecute her claims." *Id*. at 609. That is, there was evidence that the plaintiff did not need to bring a quantum meruit suit because the defendant was willing to pay for all the services provided in quantum meruit. *See id*. Here, however, there is no such evidence that Champion was willing to pay for *all the meat products in question* before the Pro Parties filed the underlying lawsuit. The heart of the underlying lawsuit was who was responsible for the spoilage of certain meat products, with Champion arguing that it received spoiled meat products from the Pro Parties and the Pro Parties presenting evidence that the meat products in question were not spoiled when they left the Pro Parties' facilities. And, the jury did return a verdict in favor of the Pro Parties on their quantum meruit claim, finding that Champion owed the Pro Parties for the value of those meat products. Thus, we cannot conclude there is evidence to support no attorney's services being needed in this case. *See Cale's Clean Scene Carwash, Inc.*, 76 S.W.3d at 787.

Champion also argues that the Pro Parties failed to segregate the attorneys' fees incurred on their fraud claim from their claims against Champion 2 for breach of contract/quantum meruit. Accordingly, Champion contends there is a basis for the jury to award the Pro Parties no attorneys' fees. Under Texas law, parties claiming attorney's fees must segregate their fees "between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). "This standard does not require more precise proof for attorney's fees than for any other claims or expenses." *Id*. at 314. Thus, attorneys do not "have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of [the] petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim." *Id*.

The record reflects that the Pro Parties' trial counsel testified at trial about the reasonable and necessary attorneys' fees incurred by the Pro Parties in prosecuting their claims. Champion argues that the testimony from the Pro Parties' trial counsel was conclusory and amounted to no evidence. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501 (Tex. 2019) ("Conclusory testimony devoid of any real substance will not support a fee award."). In reviewing the testimony in question, we disagree. The Pro Parties' trial counsel specifically testified that he reviewed all the invoices for attorneys' fees and looked for tasks that were related to the unrecoverable claims. He then segregated and removed time entries that (1) were directly related to "any sort of fraud claim" that the Pro Parties had pursued or (2) were related to claims against Champion 2. He testified that the attorneys' fees for the unrecoverable claims were in the invoices, as shown in Plaintiff's Exhibit 9, but were removed from Plaintiff's Exhibit 16, the exhibit that detailed the attorneys' fees for the recoverable claim. He further explained that the amount of attorneys' fees in Plaintiff's Exhibit 9 were over $200,000, but that the requested

attorneys' fees in Plaintiff's Exhibit 16 were $166,000. Thus, the Pro Parties' trial counsel did testify in sufficient detail about the segregation of attorneys' fees; his testimony was not conclusory on the subject.[5]

Champion further argues that the trial court erred in granting the JNOV on attorneys' fees because Champion's trial counsel "put on controverting evidence regarding trial and conditional appellate fees, which the jury weighed and considered." In the testimony pointed to by Champion, Champion's trial counsel testified that the amount in controversy in this case was $73,000. Champion's trial counsel then detailed how he and his co-counsel have spent "over 450 hours of legal work" on this case, with his co-counsel spending "over 135 hours" on this case and his firm spending "325 hours." Champion's trial counsel then testified he charges $395 per hour and his co-counsel charges $400 per hour. He testified the reasonable fee for his and his co-counsel's services was $225,000. He testified that at the time of trial, Champion had paid him and his co-counsel "over $200,000 in legal fees." Champion's trial counsel further testified that this case was about "principle" for Ayala and so Ayala had asked Champion's request for attorneys' fees to be "cap[ped]" at $72,000, or the amount in controversy. None of this testimony contradicts the testimony provided by the Pro Parties' counsel with respect to the reasonable and necessary attorneys' fees to prosecute the Pro Parties' quantum meruit claim. Nor does this testimony support an attorney fee award of zero dollars on the Pro Parties' successful quantum meruit claim. Further, while Champion argues that it "vigorously cross-examined" the Pro Parties' trial counsel

---

[5]We note that Champion argues the "Pro Parties also failed to offer any evidence segregating their attorney's fees on their breach of contract and quantum meruit claims by showing they were intertwined. Specifically, the Pro Parties failed to present any evidence that such claims were intertwined." This is the full extent of Champion's argument, and it is insufficiently briefed. *See* TEX. R. APP. P. 38.1(i). And, even if it were sufficiently briefed, the evidence in the record shows the Pro Parties' breach of contract and quantum meruit claims were intertwined. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006) (explaining no segregation of attorneys' fees is needed where "discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.").

"regarding the reasonableness and necessity of the Pro Parties' requested fees," in reviewing the testimony in question, the Pro Parties' trial counsel was firm in his testimony. In reviewing the evidence under the appropriate standard of review, we cannot conclude that more than a scintilla of evidence supports the jury's finding of an attorneys' fee award of zero dollars. *See B & W Supply*, 305 S.W.3d at 15.

Finally, we note that the concurring and dissenting opinion argues that this cause should be remanded for a new trial on the issue of the Pro Parties' attorneys' fees. It relies on *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009), for the proposition that "generally, 'the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue to be determined by the jury.'" *Id*. (quoting *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990)). The concurring and dissenting opinion recognizes that there is "an exception to this rule" "where the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Id*. (quoting *Ragsdale*, 801 S.W.2d at 882). Nevertheless, the concurring and dissenting opinion argues this exception does not apply because the Pro Parties' attorneys' fees were unreasonable as a matter of law in light of the amount involved and the results obtained. *See id*. at 548. Thus, the concurring and dissenting opinion argues that the evidence of the Pro Parties' attorneys' fees did no more than raise a fact issue to be decided by the jury and this cause should be remanded for a new trial on the issue of the Pro Parties' attorneys' fees. *See id*.

The supreme court in *Smith* held that the *Arthur Andersen* factors apply "to an appellate court's assessment of whether fees were established as a matter of law." *Id*. Thus, in determining

the reasonable and necessary attorneys' fees, an appellate court must consider "the amount of money involved" "and the results obtained." *Id*. (quoting *Arthur Andersen & Co. v. Perry Equip. Co.*, 945 S.W.2d 812, 818 (Tex. 1997)). In *Smith*, the prevailing party's attorney testified that "a reasonable fee for the preparation and trial of the case would be $47,438.75, plus $15,000 for appeals, for a total of $62,438.75." *Id*. at 546. The prevailing party sought over $200,000 in damages, but the jury awarded only $65,000. *Id*. The prevailing party asked for a total of $62,438.75 in attorney's fees, but the jury awarded no attorney's fees. *Id*. Because the prevailing party was entitled to attorney's fees under chapter 38 of the Texas Civil Practice and Remedies Code, it moved "to disregard the jury's refusal to award attorney's fees." *Id*. The trial court granted judgment notwithstanding the verdict on attorney's fees and rendered judgment, awarding the prevailing party $7,500 for fees incurred through trial and up to $15,000 in conditional appellate attorney's fees. *Id*. at 546-47. "The court of appeals vacated the $7,500 attorney's fee award and rendered judgment for $47,438.75 instead, holding that '[b]ecause the [prevailing party] presented competent, uncontroverted evidence of its right to attorney's fees and because the [liable party] did not challenge the amount, nature, or necessity of these fees . . . the trial judge abused his discretion in awarding $7,500.'" *Id*. at 547 (quoting *Smith v. Patrick W.Y. Tam Trust*, 235 S.W.3d 819, 828 (Tex. App.—Dallas 2007), *rev'd in part*, 296 S.W.3d 545 (Tex. 2009)). The supreme court agreed the prevailing party's evidence of attorney's fees was undisputed but explained that "even though the evidence might be uncontradicted, if it is unreasonable, incredible, or its belief is questionable, then such evidence would only raise a fact issue to be determined by the trier of fact." *Smith*, 296 S.W.3d at 547-48 (quoting *Ragsdale*, 801 S.W.2d at 882). In reviewing the record in *Smith*, the supreme court concluded that the attorney's fee requested by the prevailing party, "though supported by uncontradicted testimony, was unreasonable in light of the amount involved

and the results obtained, and *in the absence of evidence that such fees were warranted due [to] circumstances unique to this case.*" *Id*. at 548 (emphasis added). Thus, while the supreme court agreed that "no evidence supported the jury's refusal to award any attorney's fees (as the court of appeals correctly noted)," the court of appeals "was not free to set a reasonable fee on its own." *Id*.

Here, however, the evidence does not support a finding that the Pro Parties' fees are unreasonable as a matter of law. *See id*. The *Arthur Andersen* factors include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). The concurring and dissenting opinion, like *Smith*, relies on the fourth factor, the amount involved and the results obtained, to conclude that the Pro Parties' evidence of its reasonable and necessary attorneys' fees is unreasonable as a matter of law. However, in doing so, the concurring and dissenting opinion ignores other evidence in the record that is unique to the facts of this case.

Both Champion and the Pro Parties presented evidence in this case that their respective reasonable and necessary attorneys' fees *were over two hundred thousand dollars*. While Champion failed to present any evidence contradicting the Pro Parties' evidence of reasonable and

necessary attorneys' fees, Champion did present its own evidence of the reasonable and necessary attorneys' fees incurred in this case. Champion's attorney testified that the amount in controversy in this case was only $72,000. Nevertheless, Champion's attorney testified that up to the time of trial, Ayala, as agent for Champion, paid over $210,000 in attorneys' fees relating to this case. In terms of the amount of time involved, Champion's attorney testified that 450 total hours of legal work had been spent on the case before trial began, his billing rate was $395 per hour, another attorney who worked 135 hours on the case had a legal rate of $400 per hour, and thus "the reasonable legal fee" for their services up to the time of trial was $225,000. Champion's attorney further testified that his reasonable and necessary attorney's fees incurred during trial were $5,000 per day for the seven-day trial or another $35,000. He further testified that the reasonable and necessary attorneys' fees for any appeal was $20,000 for the intermediate court of appeals and $15,000 for the supreme court.

Champion's attorney testified that the most important reason Ayala was litigating this case "was his reputation and his business reputation and his relationships with his customers and what this case meant . . . for that, for that issue." He further testified that Ayala's reputation and his business reputation "was a huge factor with respect to Mr. Ayala and the way that he viewed this case and the importance of this case to his business and the goodwill that he had with his customers and other suppliers and other people in the community." Champion's attorney further testified that for Ayala, "this is really and truly not about the money. It's about the principle . . ." According to Champion's attorney, Ayala had asked him to "cap or limit the attorney's fees" that Champion requested in this case to $72,000, which was the amount in controversy. Champion's attorney testified that "[t]he balance of [the attorney's fees incurred] for him [was] the principle of the matter—that he feels he's been wronged and his business has been hurt." "And so, this is why he

has defended the case, but at the same time it's not about the money for him." Champion's attorney emphasized that "this has been a very contested case."

The record thus reflects that (1) over $250,000 in attorneys' fees was reasonable and necessary in Champion's litigation of this case; (2) $35,000 in conditional appellate attorneys' fees was reasonable and necessary; (3) Ayala's request for a lower amount of attorneys' fees was related to him continuing the case for reasons of "principle"; (4) the case was very contested and litigious; and (5) Champion had adequate opportunity to contest the reasonableness and necessity of the Pro Parties' attorneys' fees during trial. In light of this evidence, we cannot conclude that the evidence the Pro Parties presented of their reasonable and necessary attorneys' fees was unreasonable as a matter of law pursuant to *Smith*, especially when Champion had adequate opportunity to contest the evidence presented by the Pro Parties during trial. Additionally, the record reflects that the Pro Parties presented the following evidence of their reasonable and necessary attorneys' fees: (1) itemized invoices of all the legal work performed; (2) testimony from the operating manager for the Pro Parties that the Pro Parties had paid or incurred all the attorneys' fees provided for in the invoices; and (3) testimony from Kevin Terrazas, the Pro Parties' attorney. At trial, Terrazas testified as to the relevant *Andersen* factors. He discussed his qualifications and experience, and testified, without objection, as an expert regarding the reasonableness and necessity of the attorneys' fees in this case. He testified that he was familiar with the fee customarily charged in the area for similar legal services. He testified as to the rates charged and talked about the time and labor required in this case, which was supported by the invoices admitted in evidence. He testified about how he reviewed the different pleadings, motions, and discovery to ensure that the time spent on the particular legal matters and rates charged were reasonable and necessary. He also compared the invoices submitted by the Pro Parties to the attorneys' fees

statements submitted by Champion to ensure that the Pro Parties' fees were reasonable as compared to what Champion's attorney charged. Like Champion's attorney, Terrazas testified that "this was a hard-fought case" with "a lot of arguments" and "a lot of objections," which "increased the time that [the Pro Parties' attorneys] had to spend trying to litigate this case." Terrazas testified that "there was a lot of that throughout this case, a lot of motions" and "several depositions," which "increased the cost overall." Thus, attorneys for both sides in this case testified that the reasonable and necessary attorneys' fees were over two hundred thousand dollars. They both testified about the complexity and litigious nature of this case. Further, Champion's attorney testified that Ayala was not only motivated by money but also pursued this litigation because he felt wronged. On this record, we cannot hold that the Pro Parties' attorneys' fees are unreasonable as a matter of law. Thus, we conclude *Smith* is factually distinguishable from this case. *See In re Macy Lynne Quintanilla Tr.*, No. 04-17-00753-CV, 2018 WL 4903068, at *6 (Tex. App.—San Antonio Oct. 10, 2018, no pet.) (holding that because trial counsel's affidavit was uncontroverted and established the reasonableness of the attorneys' fees sought in line with the applicable factors, *Smith* was factually distinguishable); *In re Guardianship of Litoff*, No. 04-11-00800-CV, 2013 WL 1223629, at *2 (Tex. App.—San Antonio Mar. 27, 2013, pet. denied) (holding that trial court properly granted JNOV because the testimony established the reasonable and necessary attorney's fees as a matter of law and the record did not support the jury's finding that the reasonable fee was $0); *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 155 (Tex. App.—Dallas 2012, no pet.) (distinguishing *Smith* by recognizing that there is no rule that attorney's fees cannot be more than actual damages and holding that on the record presented, $135,000 in attorneys' fees was legally and factually sufficient). We thus hold that the Pro Parties established their reasonable and

necessary attorneys' fees as a matter of law and find no error by the trial court in awarding the Pro Parties their attorneys' fees.

**D. Whether the trial court erred by allowing the Pro Parties to impermissibly re-open the evidence and by awarding the Pro Parties additional post-verdict attorneys' fees related to the filing of the Pro Parties JNOV**

After the trial court granted the Pro Parties' motion for JNOV on the issue of attorneys' fees, the Pro Parties filed a "Motion for Post-Verdict Attorneys' Fees and Motion to Enter Final Judgment." In that motion, the Pro Parties requested that pursuant to section 38.001, the trial court award them "the reasonable and necessary attorney fees incurred in preparing and arguing their successful motion for judgment notwithstanding verdict against Champion" and in defending against Champion's unsuccessful post-verdict motion to disregard jury findings, motion for judgment notwithstanding the verdict, motion for new trial, and motion to adjudge costs. Champion filed a response, objecting that the Pro Parties sought to impermissibly re-open the evidence in violation of Texas Rule of Civil Procedure 270. The trial court granted the Pro Parties' motion and awarded the Pro Parties an additional $9,386.00 in post-verdict attorneys' fees.

On appeal, Champion argues that by granting the Pro Parties' motion and awarding additional attorneys' fees, the trial court impermissibly re-opened the evidence pursuant to Texas Rule of Civil Procedure 270. According to Champion, the Pro Parties should have presented such evidence relating to these additional attorneys' fees to the jury at the time of trial. In response, the Pro Parties argued the trial court had authority to award additional post-verdict attorneys' fees.

In their live petition, the Pro Parties sought "reasonable and necessary attorneys' fees" under section 38.001 of the Texas Civil Practice and Remedies Code. At trial, the Pro Parties submitted the issue of their attorneys' fees to the jury. The Pro Parties' request for attorneys' fees included future attorneys' fees. At trial, counsel for the Pro Parties testified about these future

attorneys' fees: "And so my opinion is $166,674.00 through the start of trial, and then $7,500.00 depending on however many days we go in trial, which hopefully will not be too much longer. But it is what it is, and I understand that trials do take some time." The Pro Parties further requested other future contingent fees, including for appeals to this court and the supreme court.

Texas Rule of Civil Procedure 270 allows a trial court to permit additional testimony "[w]hen it clearly appears to be necessary to the due administration of justice," "*provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury*." TEX. R. CIV. P. 270 (emphasis added). The issue of attorneys' fees was tried to the jury in this case. The jury issued its verdict and was discharged. Thus, the trial court would have authority to re-open the evidence only if the issue of attorneys' fees was not "a controversial matter." For example, in *Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 26 (Tex. 1987), the supreme court explained that "[t]he recovery of prejudgment interest does not require any evidentiary proof at trial." In following this precedent, the Fourteenth Court of Appeals held in *Apache Corp. v. Castex Offshore, Inc.*, 626 S.W.3d 371, 384-85 (Tex. App.—Houston [14th Dist.] 2021, pet. denied), that nothing in Rule 270 precludes a trial court from considering evidence showing that a party had actually paid its attorney's fees before the entry of judgment and was thus entitled to prejudgment interest. The court noted that "trial courts routinely decide matters relating to prejudgment interest in post-verdict proceedings." *Id*. at 385. Here, however, the issue was not prejudgment interest but was instead the amount of reasonable and necessary attorneys' fees relating to post-verdict proceedings, which is a question of fact to be determined by the factfinder. *See Rohrmoos*, 578 S.W.3d at 498. That is, even though the Pro Parties requested additional attorneys' fees for work done after the jury's verdict, a party seeking contingent attorneys' fees from a jury must provide evidence at trial regarding such fees. *See Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355

(Tex. 2020) (explaining that the party seeking contingent appellate attorneys' fees must provide evidence at trial regarding the services "it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services").

The Pro Parties cite the following two cases for the proposition that "courts have held that a party's post-trial, pre-judgment filing requesting attorneys' fees may constitute a trial amendment supporting an award for attorneys' fees": *Swate v. Medina Cmty. Hosp.*, 966 S.W.2d 693, 701 (Tex. App.—San Antonio 1998, pet. denied), and *Good v. Baker*, 339 S.W.3d 260, 266-67 (Tex. App.—Texarkana 2011, pet. denied). *Swate*, however, involved a post-verdict award of attorneys' fees following a *bench trial*. *Swate*, 966 S.W.2d at 701. *Good* is also distinguishable as the parties in that case stipulated during a jury trial that they would submit the issue of attorneys' fees to the trial court. *Good*, 339 S.W.3d at 266.

The Pro Parties also cite the following two cases for the proposition that "[o]nce the right to attorneys' fees is established, the court may award post-trial attorneys' fees, including for any appeal": *Wright v. Wright*, 280 S.W.3d 901, 915 (Tex. App.—Eastland 2009, no pet.), and *United States Bank Nat'l Ass'n v. Denning*, No. 1:15-CV-00239, 2016 WL 8904963, at *1-2 (W.D. Tex. Sept. 19, 2016) (*Denning II*). However, both cases are again distinguishable. *Wright* stems from a divorce in which the trial court awarded appellate attorneys' fees pursuant to a mediated settlement agreement. *Wright*, 280 S.W.3d at 914. The issue of attorneys' fees was not tried to the jury. *See id*. Similarly, in *Denning*, there was no jury trial; the federal district court granted summary judgment. *See United States Bank Nat'l Ass'n v. Denning*, No. 1:15-CV-00239, 2016 WL 8904534, at *11 (W.D. Tex. June 7, 2016) (*Denning I*). It then allowed the plaintiff to supplement its request for attorneys' fees in light of the defendant's unsuccessful motion for reconsideration.

*See Denning II*, 2016 WL 8904963, at \*2. Thus, the authority cited by the Pro Parties is inapplicable to the facts presented here.

We hold that pursuant to Texas Rule of Civil Procedure 270, the trial court erred in re-opening the evidence with respect to the Pro Parties' attorneys' fees relating to filing its motion for JNOV and defense of Champion's motion for new trial. *See* TEX. R. CIV. P. 270. Because there was no other evidence at trial presented by the Pro Parties in support of these attorneys' fees, Champion was harmed by the re-opening of the evidence on the issue. *See* TEX. R. APP. P. 44.1. Accordingly, we reverse the trial court's judgment to the extent that it awarded the Pro Parties $9,386.00 in post-verdict attorneys' fees.

### THE PRO PARTIES' AWARD FOR COSTS AND INTEREST

Champion argues that if we sustain its first two issues and thus determine the Pro Parties are not prevailing parties, we should conclude the trial court erred in awarding the Pro Parties costs and interests. We have not sustained the first two issues and conclude the Pro Parties remain prevailing parties. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 587 (Tex. App.—San Antonio 2011, no pet.) (explaining that a "successful party" is the one who obtains a judgment vindicating a civil claim of right); *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 895 (Tex. App.—San Antonio 1996, writ denied) ("In suits involving claims and counterclaims, the party receiving the larger award is entitled to final judgment and recovery of its costs."). Therefore, the trial court did not err in awarding the Pro Parties costs and interest. *See* TEX. R. CIV. P. 131, 141.

**DIRECTED VERDICT ON CHAMPION'S CLAIMS FOR VIOLATIONS OF DTPA AND BREACH OF IMPLIED WARRANTY**

After both sides rested and closed, the trial court granted directed verdicts as to Champion's claims for DTPA, promissory estoppel, breach of implied warranty, fraud, fraud by nondisclosure, and negligent failure to disclose. On appeal, Champion argues the trial court erred in granting the directed verdicts on their DTPA and breach of implied warranty claims because there was legally sufficient evidence of both claims.

*1. Champion's DTPA Claim*

In its live pleading, Champion alleged that the Pro Parties violated the DTPA because their acts "were false, misleading, and/or deceptive within the meaning of" sections 17.45, 17.46(b)(2), (5), (7), (24), and 17.50 of the Texas Business and Commerce Code. *See* TEX. BUS. & COMM. CODE §§ 17.46(b)(2) ("causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services); 17.46(b)(5) "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not"); 17.46(b)(7) ("representing that goods are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"); 17.46(b)(24) ("failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed"); 17.50 (allowing a consumer to maintain an action for "a false, misleading, or deceptive act or practice that is" "specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter" and is "relied on by a consumer to the consumer's detriment"). Specifically, Champion alleged the Pro Parties promised the meat products would be fit for human consumption

but instead "delivered meats that were unwholesome, spoiled, tainted, and/or unfit for human consumption." Champion argues in its brief that there was evidence at trial that "the meat products provided by the Pro Parties for resale were either rotten, destroyed, or unmerchantable."

In response, the Pro Parties argue that the evidence at trial showed nothing more than an alleged breach of contract by the Pro Parties and that Texas law requires some "evidence of a deceptive trade practice," or "fraud" by the Pro Parties other than a mere breach of contract. They point out that Champion's "sole complaint" with respect to DTPA "is the allegation that the Pro Parties agreed they would deliver meat fit for human consumption but instead delivered spoiled meat." The Pro Parties emphasized that "this is the exact same allegation that sits at the heart of Champion's breach of contract claim."

"An allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Tony Gullo Motors I*, 212 S.W.3d at 304 (quoting *Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983)). The "mere breach of contract is not fraud" and is not "evidence of fraud." *Id.* (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 252 (Tex. 1962)). For example, evidence that a car dealership failed to deliver "a Highlander Limited" is insufficient to prove a DTPA claim. *See id.* To prove a DTPA in addition to a breach of contract claim, the evidence would need to show the car dealership "never intended to do so." *See id.* Here, through Ayala's testimony, Champion presented some evidence at trial that the meat products delivered by the Pro Parties were spoiled. However, Champion failed to prove more than a mere breach of contract. *See id.* There was no evidence of any false, misleading, or deceptive acts on the part of the Pro Parties, like evidence that they knowingly delivered spoiled meat. *See id.* Therefore, we hold the trial court did not err in granting a directed verdict on Champion's DTPA claim.

### 2. *Champion's Breach of Implied Warranties Claim*

Champion also alleged that "[e]very agreement for the sale of goods, and in particular for food products, includes implied covenant of merchantability and fitness for human consumption." According to Champion's live pleading, the Pro Parties breached "the implied covenant of merchantability and fitness for human consumption" by selling spoiled meat. The elements of a cause of action for breach of the implied warranty of merchantability are: (1) the defendant sold or leased a product to the plaintiff; (2) the product was unmerchantable; (3) the plaintiff notified the defendant of the breach; and (4) the plaintiff suffered injury. *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003, no pet.).

At the close of evidence, the Pro Parties moved for a directed verdict on Champion's breach of implied warranty of merchantability claim, arguing that there was no evidence that (1) Champion notified them of the breach within a reasonable time; (2) the Pro Parties sold the alleged spoiled meat; and (3) Champion suffered damages as a result. On appeal, Champion argues that the trial court erred in granting the directed verdict because it produced legally sufficient evidence of each element.

With regard to the element of notice, section 2.607 of the Texas Business and Commerce Code provides that "[w]here a tender has been accepted . . . the buyer must *within a reasonable time after he discovers or should have discovered any breach* notify the seller of breach or be barred from any remedy." TEX. BUS. & COM. CODE § 2.607(c)(1) (emphasis added). "The burden is on the buyer to establish any breach with respect to the goods accepted." *Id*. § 2.607(d). "Failure to notify the seller of the breach, thereby allowing the seller an opportunity to cure, bars recovery on the basis of breach of warranty." *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 189 (Tex. App.—Dallas 1996, no writ).

Champion argues there was evidence that it notified the Pro Parties of the alleged spoiled meat within a reasonable time because Ayala testified that he notified the Pro Parties as soon as he was notified by his customers. Ayala, however, did not testify as an expert and at no point did he testify about industry standards. The only evidence regarding industry standards came from the Pro Parties' expert Hinojosa who testified that once a customer signs for a delivery, the customer has only one to two days to report any problems with the delivery. As noted previously, Hinojosa explained the reasons for this industry standard. It is undisputed that Champion notified the Pro Parties of the alleged spoiled meat products five months after the date of the last delivery of meat products by the Pro Parties. It is also undisputed that after a full inspection, Champion signed for delivery of the meat products, indicating acceptance of the meat delivered. Therefore, it is undisputed that under industry standards, Champion's actions in providing notice of the alleged spoiled meat were unreasonable.

We note that Champion points to invoices that were admitted in evidence that show some discounts given by the Pro Parties. According to Champion, these invoices are evidence that the Pro Parties were notified of the quality issues. However, the invoices do not indicate *why any reductions happened* or *when the reductions happened*. And, during his testimony, Ayala was incapable of testifying as to *when* he notified the Pro Parties of the alleged spoiled meat, stating that he did not remember.

As noted, the Pro Parties presented expert testimony that it is the industry standard in the meat distribution business to allow only a few days to pass before notifying a distributor about an issue with spoilage. Champion offered no evidence controverting this industry standard. We therefore hold the trial court did not err in granting a directed verdict on Champion's breach of implied warranty claim. *See Lochinvar Corp.*, 930 S.W.2d at 190 (explaining that while notice is

usually a question of fact to be determined by a trier of fact, it is a question of law "where there is no room for ordinary minds to differ about the proper conclusion to be drawn from the evidence").

### SUFFICIENCY OF EVIDENCE OF CHAMPION'S BREACH OF CONTRACT CLAIM

In Question No. 6, the jury found that the Pro Parties "fail[ed] to comply with the agreement." In Question No. 7, the jury determined that the amount of lost profits resulting from the Pro Parties' breach was zero dollars. Champion filed a motion for new trial, arguing that the jury's answer to Question No. 7 was so against the great weight and preponderance of the evidence that it was wrong and unjust. On appeal, Champion argues the trial court erred in denying its motion for new trial on this ground.

"When a party attacks the factual sufficiency of an adverse finding on an issue on which [it] has the burden of proof, [it] must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). "The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*. If the court of appeals determines the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust, "the court of appeals must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id*. (citation omitted).

Champion argues that it presented evidence that the meat products provided by the Pro Parties for resale were either rotten, destroyed, or unmerchantable. Specifically, it points to Ayala's testimony that Champion received approximately $30,000 of rotten meat from the Pro Parties and that it lost customers as a result of the Pro Parties' actions, which caused approximately

$650,000.00 in lost profits. In response, the Pro Parties argue that Champion has not met the high burden of showing the jury's zero damages finding was so against the great weight and preponderance of the evidence to be clearly wrong and unjust. The Pro Parties emphasize that while Champion relies on Ayala's testimony that Champion received $30,000 of spoiled meat, this testimony in and of itself is not evidence of lost profits because there was evidence that Champion did not pay the Pro Parties for $30,000 worth of meat products delivered.

Further, the Pro Parties argue that while Champion relies on Ayala's testimony of $650,000 in lost profits, Ayala's testimony of lost profits amounts to no evidence. Under Texas law, merely testifying as to the amount of claimed lost profits without providing any indication of how the lost profits were determined is legally insufficient evidence. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *see also Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 28 (Tex. App.— Texarkana 2018, pet. denied) (holding that company president's testimony regarding $120,000.00 in damages without supporting evidence of how he determined such estimates was legally insufficient); *Columbia Med. Ctr. of Denton Subsidiary, L.P. v. DFW Super Grp. II, L.L.C.*, No. 02-12-00507-CV, 2013 WL 5658185, at *3 (Tex. App.—Fort Worth Oct. 17, 2013, pet. denied) (holding that testimony as to lost profits without evidence showing how they were determined amounts to no evidence). At trial, when asked how much Champion lost in profits, Ayala testified that Champion lost $650,000 because it lost four customers. However, Ayala provided no methodology for his lost profits determination and his testimony was not supported by other evidence. In its brief, Champion argues that Ayala identified four customers Champion lost and then added up how much *in sales* Champion lost over a two-and-a-half period. Lost sales do not necessarily equate to lost profits, and Ayala provided no methodology of how in this case lost revenues could equate to lost profits. We therefore conclude Champion has not met its burden of

demonstrating that the jury's finding of zero damages was against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242.

## ADVERSE EVIDENTIARY RULINGS AGAINST CHAMPION

### A. *Frozen Meat Products in Refrigerated Truck*

First, Champion argues that the trial court abused its discretion in not permitting the jury to view the frozen meat in question. For trial, Champion transported in a refrigerated truck 102 boxes of frozen meat that it allegedly had received from the Pro Parties. Champion parked its refrigerated truck outside the courthouse and asked for the meat products in the truck to be admitted as an exhibit for the jury's inspection so that it could show the jury "the manner in which Champion received the spoiled meat products from the Pro Parties"; "that because the products are frozen, they do not have a noticeable smell"; and "a general visual of the boxes for context." Champion also sought to defrost the meat products to demonstrate how they smell after defrosting but not while frozen. Champion argued the meat products were in the same, or substantially the same, condition as they were when first delivered by the Pro Parties. The Pro Parties objected, arguing that the exhibit was not relevant and that it was unduly prejudicial. *See* TEX. R. EVID. 401, 403. The trial court sustained the objection on prejudicial grounds under Texas Rule of Evidence 403, noting that the state of the boxes the jury was going to see in the refrigerated trucks differed from a photo the trial court previously reviewed depicting the boxes. The trial court noted that the delivery of the boxes by the Pro Parties had been over three years before trial and that the boxes had "been moved and traveled and rearranged and traveled." The trial court noted that the current condition of the boxes was not the same as three years ago when they were delivered and that it

would be unduly prejudicial for the jurors to be given the impression that they were the same as when delivered.

Rule 403 provides that the trial "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Unfair prejudice" "means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *See Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). "Trial courts play a vital role in evaluating evidence." *Id*. at 544. "Being present in the courtroom and having the most familiarity with the case, the trial court is best positioned to assess whether evidence is unfair or potentially misleading." *Id*. "When a Rule 403 objection is at issue, the trial court must balance probative value against the relevant countervailing factors to determine admissibility." *Id*. at 544-45. "The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement." *Id*. at 545.

Further, if we determine the trial court abused its discretion in erroneously excluding evidence, we must then determine whether the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a); *see JBS Carriers, Inc. v. Wash.*, 564 S.W.3d 830, 836 (Tex. 2018). Under this standard, if the erroneously excluded evidence was "'crucial to a key issue,' then the error was likely harmful—that is, it probably caused the rendition of an improper judgment— unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *JBS Carriers, Inc.*, 564 S.W.3d at 836. As an appellate court, we must uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling.

*Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 264 (Tex. 2012); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Here, Champion argues that the excluded evidence's probative value was showing the jury that the meat products were frozen and did not smell. Champion claims that this evidence "would have supported the issue of notice concerning the breach of contract, DTPA, and breach of warranty claims." However, Champion was able to introduce other evidence showing that the meat products were frozen and did not smell. And, as noted above, what Champion was missing in this case was evidence that under industry standards, Champion was reasonable in notifying the Pro Parties of the meat products five months after delivery. The frozen meat products in the refrigerated truck would not have provided any evidence relating to the reasonableness standard in the industry. Thus, any relevancy provided by the excluded evidence was cumulative of other evidence presented. Further, the trial court could have reasonably concluded that the different appearance of the frozen meat products that had been sitting in Champion's freezers for over three years would mislead and unfairly prejudice the jury. Therefore, we hold the trial court did not abuse its discretion in excluding this evidence under Rule 403. *See Diamond Offshore Servs.*, 542 S.W.3d at 544-45.

*B. Text Messages*

Second, Champion argues that the trial court abused its discretion in excluding Defendant's Exhibits 3, 4 and 5, which it states are text message exchanges that were excluded. Champion does not state in its briefing that Defendant's Exhibits 3, 4, and 5 were made part of the appellate record as bills of exception, and we have been unable to locate any such exhibits in the appellate record.

"'[W]hen evidence is excluded by the trial court, the proponent of the evidence must preserve the evidence in the record in order to complain of the exclusion on appeal,' and failure to

do so results in waiver of the complaint." *Anderson v. Hiley Cars Hurst, LP*, No. 02-23-00091-CV, 2024 WL 3195094, at *3 (Tex. App.—Fort Worth June 27, 2024, no pet.) (quoting *Dillard v. N. Hills Manor*, No. 02-18-00309-CV, 2019 WL 5089759, at *2 (Tex. App.—Fort Worth Oct. 10, 2019, no pet.)). "To preserve the evidence in the record, the proponent must submit an offer of proof or make a bill of exception unless the substance of the excluded evidence was apparent from the context." *Id.*; *Dillard*, 2019 WL 5089759, at *2; *see* TEX. R. APP. P. 33.1(a)(1)(B), 33.2; TEX. R. EVID. 103(a)(2), (c).

With respect to Defendant's Exhibit 3, Champion argues the trial court abused its discretion in excluding the exhibit as inadmissible hearsay. In its briefing, Champion points to page six of volume six of the reporter's record where there was a discussion about whether Defendant's Exhibit 3 was inadmissible hearsay. On that page of the appellate record, Champion's trial counsel states that Defendant's Exhibit 3

> are text messages between Mr. Ayala and the plaintiffs. And that's not hearsay because those are the facts. In other words, they've been saying you didn't notify us [un]til April or you waited five months. This goes to the issue of notice. So this isn't somebody's version of the facts. These are the facts that are in question in this case. It's kind of like a fraud case. Hearsay is not, well, the representation that was made because the representation is actually part of the case, part of facts. And so that's why this would not be hearsay.

The Pro Parties' counsel emphasizes that the supposed phone number Ayala was texting in Defendant's Exhibit 3 did not belong to anyone who worked for the Pro Parties. The trial court sustained the hearsay objection and ruled Defendant's Exhibit 3 was inadmissible. This is all the information in the appellate record about these text messages in Defendant's Exhibit 3. Because it appears Champion did not make a bill of exceptions of Defendant's Exhibit 3, we have no ability to judge whether the trial court abused its discretion. *See Anderson*, 2024 WL 3195094, at *3 (explaining that because appellant "did not submit an offer of proof or bill of exception regarding

her expert's excluded testimony," the appellate court was "left to guess as to its substance and what it might prove"); *In re J.V.*, No. 02-19-00392-CV, 2020 WL 1540865, at *8 (Tex. App.—Fort Worth Apr. 1, 2020, no pet.) (holding because appellant "did not submit an offer of proof or make a bill of exception with respect to the excluded evidence," the court was "left to guess as to its substance and what it might prove"). Thus, we hold that Champion failed to show any abuse of discretion by the trial court in sustaining the hearsay objection to Defendant's Exhibit 3. *See Anderson*, 2024 WL 3195094, at *3; *In re J.V.*, 2020 WL 1540865, at *8; *see also* TEX. R. APP. P. 33.1(a)(1)(B), 33.2; TEX. R. EVID. 103(a)(2), (c).

Similarly, with Defendant's Exhibit 5, Champion argues the trial court abused its discretion in excluding the exhibit as inadmissible hearsay. In its briefing, Champion points to pages 108 to 109 of volume 5 of the reporter's record, which reflects that Ayala testified:

Q: Did [Champion's customers] ever text you about any problems with meat?

A: Yes.

Q: Can you turn to Exhibit Number 5?

   Pro Parties' counsel: May I approach?

   Court: Can you please approach?

(At the bench out of the hearing of the jury.)

   Pro Parties' counsel: Your Honor, I would ask that we not have to go through this again and again and again. It's the same thing. This is hearsay. There is [sic] not texts—it's clearly hearsay.

   Champion's counsel: Judge, it's not for the truth of the matter asserted. It's the communication that was made and then his follow-up to that. And that's what I'm going into, why does he go to their place of business because he gets the texts and he also has a photograph, which is admissible as such.

   Court: I respectfully disagree. Your objection is sustained.

This is all the information we have about the text messages in Defendant's Exhibit 5. This is insufficient information for us to judge whether the trial court abused its discretion in making its hearsay ruling. *See Anderson*, 2024 WL 3195094, at *3; *In re J.V.*, 2020 WL 1540865, at *8. Therefore, we hold that Champion has failed to show any abuse of discretion by the trial court in sustaining the hearsay objection to Defendant's Exhibit 5. *See Anderson*, 2024 WL 3195094, at *3; *In re J.V.*, 2020 WL 1540865, at *8; *see also* TEX. R. APP. P. 33.1(a)(1)(B), 33.2; TEX. R. EVID. 103(a)(2), (c).

With respect to Defendant's Exhibit 4, Champion points to pages 163 to 173 of volume 4 of the reporter's record. The record reflects that on those pages, one of Champion's customers, Angel Lubian, testified about receiving spoiled meat from Champion and that he "sent a message to the supplier," i.e., Champion. The Pro Parties' counsel objected, arguing the text messages Champion was trying to introduce in Defendant's Exhibit 4 had not been properly produced in discovery and that the text messages were inadmissible on hearsay and authentication grounds. Outside the presence of the jury, Lubian testified he had text messages with "the owner of the company Champion." The text messages at issue were included in Defendant's Exhibit 4, which the trial court reviewed and stated the following:

> Respectfully, [the text messages are] not coming in. Let the record reflect that it's the same four digits in Defense Exhibit 4. There is only—it appears one text August 1st, one text September—actually two texts on September 9th. And then—that's all that I see. And it could be a couple more, but there's also one, two, three photos that have since been enlarged. It's not coming in. But you can ask him whatever else you'd like. It's 4:25 [p.m.] But there'll be no testimony with regard to any documents or photos. There's a rule that anything [Champion] want[s] to present that wasn't provided by the witness, [Champion is not] allowed to come in today and discuss those if they didn't—if they were not produced in advance. And so with that, we're going to go ahead and bring in our jury.

Champion argues the trial court erred because it had previously produced Defendant's Exhibit 4 and that the trial court erred in excluding the exhibit under Texas Rule of Civil Procedure

193.6. However, even if we were to conclude the trial court did err in excluding the exhibit under Rule 193.6, Champion does not point to where Defendant's Exhibit 4 was introduced as a bill of exception for this court to review. All we know from the portions of the reporter's record cited by Champion is that the text messages related to Angel Lubian complaining to Ayala about spoiled meat. Angel Lubian testified to these facts during his testimony. Thus, because Angel Lubian testified to these same facts, Champion has failed to show how it was harmed by the exclusion of these text messages. The record does not show how the text messages in Defendant's Exhibit 4 are not merely cumulative of Angel Lubian's testimony. For that reason, Champion has not met its burden of showing how any error by the trial court in excluding Defendant's Exhibit 4 "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a).

## CONCLUSION

For the reasons stated above, we conclude the following: (1) the trial court did not err in charging the jury on the Pro Parties' quantum meruit claim and in rendering judgment in favor of the Pro Parties; (2) the trial court did not err in granting a JNOV and awarding the Pro Parties their attorneys' fees; (3) the trial court erred in re-opening the evidence and awarding the Pro Parties additional post-verdict attorneys' fees relating to the filing of the Pro Parties' JNOV; (4) the trial court did not err in awarding the Pro Parties costs and interest; (5) the trial court did not err in granting directed verdicts on Champion's DTPA and breach of implied warranty claims; (6) Champion did not meet its burden of demonstrating that the jury's finding of zero damages on its breach of contract claim was against the great weight and preponderance of the evidence; (7) the trial court did not abuse its discretion in excluding the exhibit of the refrigerated truck with the frozen meat products; (8) Champion did not meet its burden of showing the trial court abused its discretion in excluding Defendant's Exhibits 3 and 5 for hearsay; and (9) even if the trial court

erred in excluding Defendant's Exhibit 4, Champion did not meet its burden of showing that any error by the trial court in excluding Defendant's Exhibit 4 probably caused the rendition of an improper judgment. Because the trial court erred in re-opening the evidence and awarding additional post-verdict attorneys' fees relating to the filing of the Pro Parties' JNOV, we reverse the trial court's February 18, 2022 order awarding the Pro Parties' $9,386.00 in additional post-verdict attorneys' fees relating to the filing of the Pro Parties' JNOV and render judgment that the Pro Parties' take nothing on their claim for additional post-verdict attorneys' fees relating to the filing of the Pro Parties' JNOV. We affirm the trial court's judgment of February 11, 2022.[6]

Liza A. Rodriguez, Justice

---

[6]Having affirmed the trial court's judgment, we need not reach the Pro Parties' alternative issue that the trial court erred in not granting the Pro Parties a new trial on their breach of contract claim.